11-4209-cv
Talavera v. Comm'r of Social Security

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: September 24, 2012      Decided: October 11, 2012)

_____

CHRISTINA TALAVERA,

*Plaintiff-Appellant*,

—v.—

MICHAEL J. ASTRUE, Commissioner of Social Security,

*Defendant-Appellee*.

Docket No. 11-4209-cv

_____

B e f o r e : STRAUB, KATZMANN, *Circuit Judges*.*

_____

Plaintiff-Appellant Christina Talavera appeals from the judgment of the United States District Court for the Eastern District of New York (Gleeson, *J.*) affirming the Social Security Administration's ("SSA") denial of her application for Supplemental Security Income disability benefits on the basis of her alleged intellectual disability. We hold that evidence of a petitioner's cognitive limitations as an adult establishes a rebuttable presumption that those limitations arose before the petitioner turned 22, as is required by SSA regulations. We further hold that a petitioner must make separate showings of deficits in cognitive and adaptive functioning in order to considered intellectually disabled under SSA regulations. Because the agency's finding that Talavera does not suffer from qualifying deficits in adaptive functioning is supported by substantial evidence, we **AFFIRM** the judgment of the district court.

_____

* Judge Robert D. Sack, originally assigned to this panel, recused himself from this case. The remaining two judges resolve this case in accordance with Second Circuit Internal Operating Procedure E(b).

Counsel for Plaintiff-Appellant:  WILLIAM P. GOTTLIEB, Axelrod & Gottlieb LLP, New York, N.Y.

Counsel for Defendant-Appellee:  SETH D. EICHENHOLTZ (Varuni Nelson, Kathleen A. Mahoney, *on the brief*), Assistant United States Attorneys, *for* Loretta E. Lynch, United States Attorney for the Eastern District of New York.

_____

KATZMANN, *Circuit Judge*:

In this case, we address two issues of first impression in this Circuit relating to the eligibility standards for Supplemental Security Income ("SSI") disability benefits on the basis of an intellectual disability under the regulatory framework promulgated by the Social Security Administration ("SSA"). We first hold that evidence of a qualifying deficit in adult cognitive functioning serves as prima facie evidence that those deficits existed prior to a petitioner's twenty-second birthday, as is required by current SSA regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, Part A, § 12.05 (hereinafter "§ 12.05") ("Mental retardation" is defined as the "onset of the impairment" occurring "before age 22."). We further hold that, to be considered mentally retarded, a petitioner must separately establish deficits in her cognitive and adaptive functioning. *See id.* (defining "mental retardation" as "significantly subaverage general intellectual functioning with deficits in adaptive functioning"); *see also Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007) (Adaptive functioning refers to an individual's "[]ability to cope with the challenges of ordinary everyday life."). In this case, because there is substantial evidence in the record supporting the SSA's finding that Plaintiff-Appellant Christina Talavera does not suffer from qualifying deficits in adaptive functioning, we affirm the judgment of the district court (Gleeson, *J.*) upholding the SSA's

2

denial of Talavera's application for SSI benefits.[1]

## BACKGROUND

Talavera appeals from the August 10, 2011 judgment of the district court, which affirmed

the decision of Defendant-Appellee the Commissioner of Social Security (the "Commissioner") to

deny her December 15, 1999 application for SSI disability benefits pursuant to Title XVI of the

Social Security Act, 42 U.S.C. § 1381 *et seq.* Although her application for SSI benefits focused

predominantly on her chronic lower back pain, Talavera primarily argues on appeal that the ALJ

erred in concluding that she does not suffer from "mental retardation," as that term is used in the

relevant SSA regulations.[2] *See* § 12.05.

Attending regular (rather than special) education classes, Talavera completed the tenth grade

of her education before dropping out in the eleventh grade. Thereafter, Talavera attempted to earn

her GED. However, when her father died, she dropped out of the GED program and began

working. In addition, Talavera later attended what she described as "business school" for one year,

but discontinued her education when the school she was attending closed down. *Talavera v.*

*Comm'r of Soc. Sec.*, No. 06-cv-3850(JG), 2011 WL 3472801, at *2 (E.D.N.Y. Aug. 9, 2011).

---

[1] Talavera also contends on appeal that the district court erred in giving inadequate consideration to her obesity and other "key evidence." These arguments, which we find unconvincing, are addressed in a separate summary order filed simultaneously with this Opinion.

[2] SSA regulations, as well as the parties on appeal, still speak of "mental retardation." *See* 20 C.F.R. Pt. 404. However, because the term is "offensive to many persons," the SSA is transitioning to using the term "intellectual disability" to represent the same concept. *See Proposed Rules: Revised Medical Criteria for Evaluating Mental Disorders*, 75 Fed. Reg. 51336-01, 51339 (proposed Aug. 19, 2010) ("We refer to 'intellectual disability' and 'mental retardation' as the same disorder."). Accordingly, this Opinion uses the terms interchangeably.

"Talavera's work experience consists of three relatively brief stints in three different jobs: receptionist for four months in 1990, telemarketer for three months in 1992, and cashier for seven months in 1996." *Id.* (footnote omitted). She testified that she had no difficulty performing her past work on account of either physical or mental limitations, and that she has no difficulty reading or writing. *See* Certified Administrative Record ("CAR") at 93-96. On October 14, 1996, a few days after suffering a back injury while lifting a box of oil cans at work, Talavera stopped working as a cashier. She has not worked since that time. *Talavera*, 2011 WL 3472801, at \*2.

In the years following her application for SSI benefits in 1999, Talavera has been diagnosed with a variety of medical ailments, including chronic back pain as the result of herniated discs in her neck and a compressed nerve in her spine, migraine headaches, carpal tunnel syndrome, obesity, depression, and anxiety. *See id.* at \*4-8. When asked at the hearing before the ALJ "why do you think you can't do . . . a simple sedentary job," Talavera testified she could not work "[b]ecause I get -- I have pain [in my back] . . . I get pain every day . . . in my lumbar spine . . . [and] my upper part of my neck which is [my] cervical spine." CAR 179-80.

Talavera lives with her mother and her brother, as well as her two young children. In her testimony before the ALJ, Talavera stated that she cannot care for her children by herself because of her back pain and other physical ailments, and instead relies on her mother's assistance. *See* CAR 140-41, 177-79. Although Talavera participates in caring for her children in various ways -- by, for example, preparing meals, feeding them, and changing diapers, *see id.* --"her mother was largely responsible for carrying and lifting objects in the household, cooking, cleaning, and shopping," *Talavera*, 2011 WL 3472801, at \*4; *see also* CAR 177-78.

4

In addition, Talavera's cognitive functioning has been examined and assessed several times by medical professionals. On December 13, 1996, three years before her accident, Talavera was examined by Dr. Aric Hausknecht, a neurologist, who determined that Talavera's memory, judgment, and communication skills were all within normal limits, as were her abilities to perform calculations, spell, follow commands, and interpret proverbs. CAR at 434. Subsequently, on February 4, 2000, Talavera was examined by Dr. Rafael Munne, a psychiatrist, who reported that Talavera was alert and fully oriented, "had average intelligence," "performed well on cognitive testing," and "seemed capable of understanding and carrying out commands in personal and social environments." *Talavera*, 2011 WL 3472801, at *7. Next, on May 10, 2000, Dr. Dinoff, a non-examining state agency psychiatrist, reviewed Talavera's medical records and concluded that she suffered from slight limitations in social functioning and slight restrictions in the "[a]ctivities of [d]aily [l]iving" as a result of her anxiety, but that there was "[n]o evidence" she suffered from mental retardation. CAR 335, 338. Thereafter, on February 8, 2001, Talavera was examined by Dr. Renee Ravid, a psychiatrist, who reported that Talavera was alert, had an intact memory, and was able to perform most simple calculations correctly. Dr. Ravid further concluded that Talavera had average intellectual functioning, and enjoyed a satisfactory ability to understand, carry out and remember instructions. *Talavera*, 2011 WL 3472801, at *8.

Finally, on September 24, 2004, Talavera was examined by Dr. Mindy Zelen, a psychologist. Dr. Zelen reported that Talavera had attended regular education throughout her school years, and had "no difficulties with learning." CAR at 509. She also informed Dr. Zelen that she is able to dress, bathe, and groom herself, but that her mother assists her with cleaning, laundry, and shopping; that she navigates public transportation on her own, and that she traveled fifteen miles on

public transportation on her own to arrive at Dr. Zelen's office that day; that she socializes with and has close relationships with her family members; that her hobbies include using computers; and that she is able to manage her own personal finances. *Id.* at 504, 509, 511. On testing, however, Dr. Zelen reported that Talavera had a verbal IQ of 66, a performance IQ of 68, a full scale IQ of 64, and that she read at a fourth grade level. *Id.* at 502-03. Dr. Zelen stated that she considered these scores "to be a valid and reliable estimate of her current functioning," and that they were consistent with a diagnosis of "[r]ule out mild mental retardation" (meaning that she could not "rule out" mental retardation based on the evidence available to her). *Id.* at 502, 504, 511-12. Dr. Zelen further observed that Talavera "was cooperative and related adequately," "was well groomed" with "appropriate" eye contact and affect, had "normal" posture and gait, used "fluent" speech, and displayed "coherent and goal-directed" thought processes. *Id.* at 510. Based on the foregoing assessments, Dr. Zelen concluded that Talavera "could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration for simple tasks, maintain a regular schedule provided it did not require performance of complex tasks, make simple decisions, and relate adequately to others." *Talavera*, 2011 WL 3472801, at *8. Dr. Zelen also concluded that Talavera exhibited "slight limitations in understanding, remembering and carrying out simple instructions, moderate limitations in making judgments on simple work-related decisions, and marked limitations in understanding, remembering and carrying out detailed instructions." *Id.* at *9.

Based on the foregoing, by Order dated September 20, 2005, an SSA Administrative Law Judge ("ALJ") concluded that Talavera was not eligible for SSI disability benefits because, despite several "severe" impairments, including chronic back pain, she retained the ability to perform

6

certain low-stress, light, and sedentary jobs. *See id.* at \*11. With regard to Talavera's mental capacity, the ALJ concluded that Talavera's claim of mental retardation was unconvincing because she completed the tenth grade, attended one year of business school, had not experienced difficulty working prior to her onset of her physical ailments, and "ha[d] cared for her children and kept custody of them." CAR at 54. The ALJ also emphasized that Talavera had been examined numerous times by medical professionals, none of whom indicated that she suffered from more than minor impairments in daily functioning. *See id.* By Order dated May 30, 2006, the SSA Appeals Council declined to review the ALJ's September 20, 2005 Order, thereby making the ALJ's Order the "final decision" of the Commissioner under 42 U.S.C. § 405(g).

Talavera appealed the ALJ's decision to the district court, arguing primarily that the ALJ erred in concluding that she did not suffer from mild mental retardation. The district court affirmed the ALJ's denial of benefits, holding that the ALJ's finding that Talavera was not intellectually disabled was supported by substantial evidence because "there was no evidence in the record demonstrating that the onset of Talavera's deficits in adaptive functioning occurred before she reached the age of 22." *Talavera*, 2011 WL 3472801, at \*11. Further, the district court rejected "Talavera's contention that her failure to graduate from high school and her marginal employment history together establish such an onset." *Id.*

Talavera appealed the district court's judgment to this Court.

## DISCUSSION

### I. *Standard of Review*

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a

correct legal standard." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009); *see also* 42 U.S.C. § 405(g). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted). In determining whether the agency's findings are supported by substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam). "We undertake a plenary review of the administrative record, and our focus is on the administrative ruling more than on the district court's decision." *Lamay*, 562 F.3d at 507.

## II.  *Eligibility Standard for SSI Disability Benefits*

To be eligible for SSI benefits, an applicant must show that "by reason of any medically determinable physical or mental impairment" resulting from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques," she is "not only unable to do [her] previous work" but also prevented from "engag[ing] in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3). SSA regulations prescribe a five-step process for evaluating disability claims:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [*per se*] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to

8

perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (internal alterations omitted). The applicant bears the burden of proof in the first four steps of the sequential inquiry; the Commissioner bears the burden in the last. *Id.*

"Mental retardation" is listed as a *per se* disability in Appendix 1 of the relevant SSA regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, Part A, § 12.00. Under SSA regulations, a petitioner suffers from mental retardation if she exhibits:

> [S]ignificantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

*Id.* § 12.05. Further, "[t]he required level of severity for this disorder is  met when" the applicant has, "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.*

III.    *Application*

Talavera contends on appeal that the district court erred by failing to find her *per se* disabled, at step three of the framework outlined above, in light of her low IQ scores.[3] Specifically, Talavera argues that the district court erred in declining to follow Courts of Appeals in other Circuits, which have held that, "absent evidence of sudden trauma that can cause retardation, the [SSI claimaint's adult] IQ tests create a rebuttable presumption of a fairly constant IQ throughout her life." *Hodges v. Barnhart*, 276 F.3d 1265, 1268 (11th Cir. 2001); *see also Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001) (same); *Luckey v. U.S. Dep't of Health &*

---

[3] We assume, as did the district court below, that Talavera's chronic back pain constitutes a "physical . . . impairment imposing an additional and significant work-related limitation of function" under § 12.05.

9

*Human Servs.*, 890 F.2d 666, 668 (4th Cir. 1989) (per curiam) (same); *Guzman v. Brown*, 801 F.2d 273, 275 (7th Cir. 1986) (same). *But see Williams v. Sullivan,* 970 F.2d 1178, 1185-86 (3d Cir. 1992) (holding that a claimant had not met his burden of establishing that his intellectual disability "exist[ed] before age 22" where medical reports predating the qualifying IQ result were silent regarding claimant's intellectual capacity, even though the earlier physicians did not administer intelligence tests).

We agree with the majority of our sister Circuits that it is reasonable to presume, in the absence of evidence indicating otherwise, that claimants will experience a "fairly constant IQ throughout [their] li[ves]." *Hodges*, 276 F.3d at 1268. As other courts have recognized, the requirement that a claimant's intellectual disability arose before age 22 "seem[s] intended to limit coverage to an innate condition rather than a condition resulting from a disease or accident in adulthood." *Novy v. Astrue*, 497 F.3d 708, 709 (7th Cir. 2007) (internal citations omitted); *see also Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 271 (6th Cir. 1991) (holding that remand was necessary to determine whether claimant's intellectual disability arose as a result of his heavy alcohol abuse after the age of 22). Accordingly, presuming relative stability in a claimant's cognitive functioning over time -- at least absent evidence of some sudden trauma that could have negatively affected her mental capacity -- coheres with the apparent purpose of the regulation's age restriction. In addition, "there are many possible reasons why an adult would not have obtained an IQ test early in life," *Luckey*, 890 F.2d at 668, so requiring a contemporaneous qualifying test score would present intractable problems of proof in many cases of legitimate intellectual disability.

On the basis of the foregoing, we conclude that Talavera's evidence of a qualifying IQ score as an adult suffices to meet her prima facie burden of establishing that she suffers from "significantly subaverage general intellectual functioning . . . initially manifested . . . before age 22."[4] § 12.05.

Next, the SSA contends that Talavera has failed to meet her separate burden of establishing that she suffers from qualifying deficits in adaptive functioning. The threshold diagnostic description of mental retardation contained in SSA regulations requires that the applicant have "significantly subaverage general intellectual functioning *with* deficits in adaptive functioning." *Id.* (emphasis added). Further, SSA regulations require that the applicant's deficits in adaptive functioning be "with" her deficits in intellectual functioning. *Id.* We interpret this to mean that an applicant's inadequate adaptive functioning must arise from her cognitive limitations, rather than from a physical ailment or other infirmity. Separately, as with intellectual functioning, the regulations require that an applicant's deficits in adaptive functioning be "initially manifested . . . before age 22." *Id.*

Adaptive functioning refers to an individual's "[]ability to cope with the challenges of ordinary everyday life." *Novy*, 497 F.3d at 710 (observing that "[i]f you cannot cope with those challenges, you are not going to be able to hold down a full-time job"). Accordingly, courts have held that if one is able to satisfactorily navigate activities such as "liv[ing] on [one's] own," "tak[ing] care of . . . children . . . without help . . . sufficiently well that they have not been

---

[4] The Commissioner contends that, even assuming Talavera has met her prima facie burden in this regard, the presumption that Talavera's "significantly subaverage general intellectual functioning" arose before her twenty-second birthday has been rebutted in the circumstances of this case. We need not address this argument here, given our conclusion that Talavera has not met her separate burden of establishing that she suffers from qualifying deficits in adaptive functioning.

adjudged neglected," "pay[ing] bills," and "avoid[ing] eviction," one does not suffer from deficits in adaptive functioning. *Id.* While a qualifying IQ score may be *prima facie* evidence that an applicant suffers from "significantly subaverage general intellectual functioning," § 12.05, there is no necessary connection between an applicant's IQ scores and her relative adaptive functioning. *See, e.g.*, *Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012) (Section "12.05 requires a showing of 'deficits in adaptive functioning initially manifested during the developmental period" as well as "the satisfaction of [an] additional [IQ-based] requirement[]."); *Randall v. Astrue*, 570 F.3d 651, 656-61 (5th Cir. 2009) (per curiam) (same); *Wall v. Astrue*, 561 F.3d 1048, 1062 (10th Cir. 2009) (same); *Harris v. Comm'r of Soc. Sec.*, 330 F. App'x 813, 815 (11th Cir. 2009) (per curiam) (same); *Novy*, 497 F.3d at 709 (same); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) (same). *But see Markle v. Barnhart*, 324 F.3d 182, 187 (3rd Cir. 2003) (to be considered mentally disabled under § 12.05C, a claimant is only required to establish a qualifying IQ score, a qualifying physical limitation, and that the mental limitation began prior to age 22). Instead, the regulations recognize that "persons with an IQ in the 60s (or even lower) may still be able to hold a full-time job," and are therefore not disabled, if their adaptive functioning is sufficiently intact. *Novy*, 497 F.3d at 709.

In the circumstances of this case, we conclude that substantial evidence supports the Commissioner's finding that Talavera has not met her burden of establishing that she suffers from qualifying deficits in adaptive functioning. In particular, we note that Talavera meaningfully participates in the care of her two young children, that she completed ten years of education in regular classes and attended a year of business training, and -- up until the onset of her back problems -- she experienced no difficulties whatsoever accomplishing the tasks required during the

course of her previous periods of employment. Moreover, Talavera's cognitive faculties had been examined by a number of medical professionals prior to Dr. Zelen's administration of the IQ test, and none reported that she suffered from mental impairments that would materially limit her ability to cope with the challenges of ordinary life. *See Talavera*, 2011 WL 3472801, at \*7-9. Indeed, although Dr. Zelen noted that Talavera "appears to have cognitive deficits according to testing," she also reported that Talavera exhibited a variety of personal characteristics consistent with adequate adaptive functioning, including the ability to navigate public transportation without assistance, engage in productive social relationships, and manage her own personal finances; a facility with the use of computers; and the display of "fluent" speech, "coherent and goal-directed" thought processes, and "appropriate" affect. *See* CAR 504, 509-11. Further, Dr. Zelen concluded that, despite her cognitive limitations, Talavera "is able to follow and understand simple directions and instructions," "perform simple tasks independently," "maintain her attention and concentration for simple tasks," "maintain a regular schedule, if the schedule does not require complex tasks," "make simple decisions," and "relate adequately with others." *Id.* at 503-04. Finally, while the record indicates that Talavera suffers from some limitations in her ability to take care of her children and effectively manage a household, by Talavera's own account, these problems arise from her physical ailments, not her cognitive limitations. *See id.* at 140-41, 177-80.

For the foregoing reasons, we conclude that substantial evidence supports a finding that Talavera has failed to establish that she suffers from deficits in adaptive functioning, and is therefore not mentally retarded as that term is defined by SSA regulations. Accordingly, the judgment of the district court upholding the Commissioner's decision to deny Talavera's application for SSI disability benefits is hereby **AFFIRMED.**

13