[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-11172
Non-Argument Calendar

_____

D.C. Docket No. 8:11-cv-02861-SCB-EAJ

CARISSA HICKEL,

Plaintiff-Appellant,

versus

COMMISSIONER OF SOCIAL SECURITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(October 28, 2013)

Before HULL, MARTIN and FAY, Circuit Judges.

PER CURIAM:

Carissa Hickel appeals the district court's order affirming the Social Security

Administration's denial of her application for disability insurance benefits, 42

U.S.C. § 405(g), and supplemental security income, 42 U.S.C. § 1383(c)(3). After

review, we affirm in part, reverse in part, and remand for further proceedings.[1]

## I.    FIVE-STEP SEQUENTIAL EVALUATION

A claimant for Social Security benefits must prove that she is disabled.

Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). Under the five-step

sequential evaluation used to determine whether a claimant is disabled, the

Administrative Law Judge ("ALJ") considers: (1) whether the claimant is engaged

in substantial gainful activity; (2) if not, whether the claimant has a severe

impairment or combination of impairments; (3) if so, whether the severe

impairment meets or equals an impairment listed in the Listing of Impairments; (4)

if not, whether the claimant has the residual functional capacity ("RFC") to

perform her past relevant work; and (5) if not, whether, in light of the claimant's

RFC, age, education, and work experience, the claimant can perform other work

that exists in significant numbers in the national economy. See 20 C.F.R.

§§ 404.1520(a)(4) & (g), 404.1560(c), 416.920(a)(4) & (g), 416.960(c). The

claimant bears the burden to prove the first four steps. If the claimant does so, the

---

[1]Our review is limited to whether the Administrative Law Judge's decision is supported by substantial evidence and based on proper legal standards. Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Id. (internal quotation marks omitted). Under this limited standard of review, we do not make findings of fact, reweigh the evidence, or substitute our judgment for that of the Commissioner. Id.

burden shifts to the Commissioner to prove the fifth step.  Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999).

## II.   HICKEL'S CASE BEFORE THE ALJ

Here the ALJ determined at steps one and two that Hickel had not engaged in substantial gainful activity since birth and had the severe impairment of mild mental retardation.  At step three, the ALJ concluded that Hickel's impairment of mild mental retardation did not meet or equal a listed impairment, specifically the mental retardation listing in C.F.R. pt. 404, subpt. P, app. 1, § 12.05  (2012) ("Listing 12.05"). [2]

At step four, the ALJ concluded that Hickel had the RFC to perform a full range of work at all exertional levels, but with the non-exertional limitations that she perform only simple, unskilled, repetitive work and be given verbal instructions.  The ALJ further concluded that, based on Hickel's RFC, Hickel could perform her past relevant work as a nursery school attendant.  Alternatively, the ALJ determined at step five that Hickel could perform other work, such as small product assembler, hand packer, or eye glass assembler, based on the

---

[2]On August 1, 2013, while this appeal was pending, the Social Security Administration amended Listing 12.05 by replacing the words "mental retardation" with "intellectual disability." See 78 Fed. Reg. 46,499, 46,501 (to be codified at 20 C.F.R. pt. 404, subpt. P, app. 1).  This change was made because "the term 'mental retardation' has negative connotations," and "has become offensive to many people." Id. at 46,499.  The Social Security Administration stated that the change "does not affect the actual medical definition of the disorder or available programs or services." Id. at 46,500.  Because the amendment does not effect a substantive change, and to avoid confusion, this opinion uses the term "mental retardation" used by the parties and the ALJ.

testimony of the vocational expert. Thus, the ALJ concluded that Hickel was not disabled.

## III.    HICKEL'S APPEAL

On appeal, Hickel argues that: (1) substantial evidence did not support the ALJ's finding that her mental retardation did not meet or equal the criteria in Listing 12.05; (2) the ALJ improperly rejected the opinion of Dr. Michael Eastridge, her consulting, examining psychologist; and (3) the ALJ's hypothetical questions to the vocational expert improperly included non-existent past relevant work and failed to account for Hickel's moderate limitations in concentration, persistence, and pace.

For the reasons that follow, we conclude that substantial evidence supports the ALJ's determination at step three that Hickel's mental retardation did not meet the criteria in Listing 12.05. We further conclude that substantial evidence does not support the ALJ's decision to reject Dr. Eastridge's opinion, which requires that the case be returned to the Commissioner for further consideration at steps four and five.

## A.    Substantive Evidence Supports the ALJ's Finding at Step Three

To "meet" a listing at step three, the claimant must have an impairment that "satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement." 20 C.F.R. §§ 404.1525(c)(3),

4

416.925(c)(3).[3]  Listing 12.05 contains an introduction that includes the "diagnostic description for mental retardation" and also "four sets of criteria" in paragraphs A through D.  Id. pt. 404, subpt. P, app. 1 § 12.00(A) (2012).  If the claimant's mental impairment "satisfies the diagnostic description . . . and any one of the four sets of criteria" in Listing 12.05, then the claimant's impairment meets the mental retardation listing, and the claimant is presumed disabled.  Id.

Listing 12.05's introduction states that "mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  Id. pt. 404, subpt. P, app. 1 § 12.05 (2012).[4]  Relevant to this appeal, the claimant's mental retardation satisfies the criteria in paragraph C of Listing 12.05 when there is: (1) a "valid verbal, performance, or full scale IQ of 60 through 70"; and (2) "a physical or other mental impairment imposing an additional and significant work-related

---

[3]Hickel does not argue that her mental impairments functionally equal the criteria in Listing 12.05.

[4]The Social Security Administration's Program Operations Manual System (POMS) states that the phrase "adaptive functioning" refers to "the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age."  POMS DI 24515.056(D)(2).  Similarly, the American Psychiatric Association states that the phrase refers to how effectively an individual copes with the common demands of life and how well the individual meets the standards for personal independence expected of someone in her particular age group, sociocultural background, and community setting. Diagnostic and Statistical Manual of Mental Disorders IV–TR, at 42 (4th ed. 2000); see also Talavera v. Astrue, 697 F.3d 145, 153 (2d Cir. 2012) (explaining that the phrase "adaptive functioning" in Listing 12.05 refers to an individual's ability to cope with the challenges of ordinary life).

limitation of function." Id. § 12.05(C); see also Hodges v. Barnhart, 276 F.3d 1265, 1269 (11th Cir. 2001) ("[A] claimant meets the criteria for presumptive disability under Listing 12.05(C) when the claimant presents a valid I.Q. score of 60 to 70 and evidence of additional mental or physical impairment."). [5]

This Court has concluded that a valid IQ score of 60 to 70 after age 22 "create[s] a rebuttable presumption of a fairly constant IQ throughout [a claimant's] life." Hodges, 276 F.3d at 1268 (explaining that, absent evidence of sudden trauma that could cause retardation, a claimant who presents a valid IQ score need not also present evidence that her mental impairment arose before age 22). However, "a valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior." Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992); see also Popp v. Heckler, 779 F.2d 1497, 1499-1500 (11th Cir. 1986) (stating that the ALJ may disregard IQ test results that are inconsistent with other record evidence because the regulations require the ALJ to examine intelligence tests and other evidence, such as the medical report and the claimant's daily activities and behavior). [6]

---

[5] Hickel does not challenge the ALJ's findings that her mental retardation did not satisfy the criteria in paragraphs A, B or D of Listing 12.05.

[6] The regulations provide that "standardized intelligence tests may provide data to help verify the presence of mental retardation," but the results of such tests "are only part of the overall assessment" and "the narrative report that accompanies the test results should comment

Here, substantial evidence supports the ALJ's finding at step three that Hickel did not meet the requirements of Listing 12.05. The ALJ acknowledged that Hickel has a valid IQ score between 60 and 70.[7] Accordingly, the ALJ applied the presumption established in <u>Hodges,</u> but further found that the presumption was rebutted by other evidence that showed that Hickel did not have "deficits in adaptive functioning," as follows:

> Since the claimant has a valid full scale IQ score of 63 as an adult and valid full scale IQ scores of 59 and 65 as a child[,] [t]he claimant is entitled to the benefit of the rebuttable presumption established in *Hodges*. However, the undersigned finds that there is sufficient evidence to rebut that presumption. For example, the claimant works part time, has friends, attends church regularly, and drives. Moreover, the claimant has no limitations in her ability to care for her personal needs as she is able to prepare simple meals, groom herself, dress herself, toilet, and bathe herself. Her parents reported that she has friends in her neighborhood and takes care of her grooming. Although the claimant reported that she was in special education classes while in school, she graduated from high school. Since the undersigned finds the claimant does not have deficits in adaptive functioning, the criteria of 12.05 are not met.

(record citations omitted).

---

on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(D)(6)(a).

[7]When there are multiple IQ scores, the ALJ uses "the lowest of these in conjunction with 12.05." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(D)(6)(c). Hickel's lowest IQ score has consistently been her full scale score. In 1991, when Hickel was eight years old, she had a full scale IQ score of 59 under the Wechsler Intelligence Scale for Children–Revised. In 2001, Hickel's full scale IQ score was 63 on the Wechsler Adult Intelligence Scale–Third Edition. Both times Hickel was tested after she turned 22 (in 2009 and 2011), her full scale IQ score remained 63.

There is evidence in the record to support the ALJ's findings with respect to Hickel's daily activities and behavior. Hickel does not dispute that she is a high school graduate, she works part time at a nursery, she drives herself to work, she can prepare simple meals and dress and groom herself, she attends church regularly, and she socializes with friends.

Moreover, three medical sources—Dr. Colleen Morgan (psychologist), who examined Hickel and administered an IQ test in 2009, [8] and Drs. Martha Putney (non-examining psychologist) and Nancy Dinwoodie (non-examining medical doctor), who completed mental RFC assessments—all determined based on Hickel's better-than-expected functional capacity that Hickel's mental impairment was more consistent with borderline intellectual functioning than mild mental retardation.

Similarly, Dr. Mark Klisch—a psychologist who administered an IQ test in 2001—noted that Hickel's composite score on the Vineland Adaptive Behavior Scale was "above her intellectual level and suggests a relatively greater ability to live independently than would be predicted from her formal intelligence testing scores." Dr. Klisch explained that although Hickel's "formal academic skills pulled down her scores," her relatively strong interpersonal skills and independent

---

[8]We note that Dr. Morgan, a postdoctoral resident, conducted the psychological evaluation and prepared the report. However, Dr. Morgan was directly supervised by Dr. Jeremy Zehr, and the report was submitted as joint work product of both psychologists. For ease of reference, however, this opinion refers to Dr. Morgan.

8

living skills indicated that her adaptive functioning is "quite a bit higher than would be predicted on the basis of her formal IQ scores."

Additionally, Dr. Michael Eastridge—who performed a psychological evaluation and administered an IQ test in 2011—noted that although Hickel had intellectual functioning in the mildly retarded range throughout her life, she had "consistently functioned, in her activities of daily living, at a level that is higher than expected, given her IQ scores."  Thus, substantial evidence supports the ALJ's finding that Hickel lacked the required level of deficits in adaptive functioning to meet Listing 12.05.[9]

## B.    Steps Four and Five – Dr. Eastridge's Opinion

In determining at steps four and five whether a claimant can perform her past relevant work or other work in the economy, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.[10]  Phillips v. Barnhart, 357 F.3d 1232, 1238-39 (11th Cir. 2004); see also 20 C.F.R.

---

[9]Because substantial evidence supports the ALJ's finding that Hickel did not meet the "deficits in adaptive functioning" requirement in § 12.05's introduction, we do not address the ALJ's alternative finding that Hickel also did not have "a physical or other mental impairment imposing an additional and significant work-related limitation of function," as required by paragraph C of Listing 12.05.  See 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3) (requiring the claimant to satisfy both the criteria in the introduction and the specific criteria to meet a listing).

[10]RFC is what a claimant can do in a work setting despite any physical, mental, or environmental limitations caused by the claimant's impairment and its related symptoms.  See 20 C.F.R. §§ 404.1545(a), 416.945(a).  RFC includes physical abilities, such as standing, sitting, or walking, and mental abilities, such as understanding, carrying out instructions, or responding appropriately to supervision, co-workers, or work pressure.  Id. §§ 404.1545(b)-(c), 416.945(b)-(c).

§§ 404.1520(e), 416.920(e). In assessing RFC, the ALJ must state with particularity the weight given different medical opinions and the reasons for doing so. Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987). Without this explanation, a reviewing court cannot determine whether the decision was supported by substantial evidence. Winschel, 631 F.3d at 1179. Although the ALJ's explanation of the decision need not account for every piece of evidence, Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005), it must sufficiently explain the weight given to "obviously probative exhibits." Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981).

In evaluating medical opinions, the ALJ considers factors such as the examining relationship, the treating relationship, the doctor's specialization, whether the opinion is amply supported, and whether the opinion is consistent with the record. 20 C.F.R. §§ 404.1527(c), 416.927(c). Generally, the opinions of examining physicians are given more weight than non-examining physicians, and the opinions of treating physicians are given more weight than non-treating physicians. See id. §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2). The opinions of non-examining physicians are entitled to little weight when they are contrary to those of an examining physician, and, taken alone, they do not constitute substantial evidence. Spencer ex rel. Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir.

1985).  However, the ALJ may reject any medical opinion if the evidence supports a contrary finding.  Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1985).

Here, Hickel argues that the ALJ improperly evaluated the opinion of Dr. Eastridge.  Dr. Eastridge is a consulting, board certified clinical psychologist who performed a psychological evaluation of Hickel and conducted IQ and neuropsychological tests.

In his resulting report, Dr. Eastridge diagnosed Hickel with mild mental retardation and ADHD inattentive type.  Dr. Eastridge administered the Wechsler Adult Intelligence Scale–Fourth Edition (WAIS4) IQ test.  Hickel's full scale score was 63, the same as her previous adult IQ testing.  However, Dr. Eastridge conducted additional tests, including the Conners' Continuous Performance Test, the logical memory subtests from the Wechsler Memory Scale–Revised (WMSR), and the working memory subtests of the WAIS4, all of which showed significant weaknesses in Hickel's working memory, attention, and concentration.  Hickel's score on the logical memory portion of the WMSR put her in the 2nd percentile for immediate and delayed recall of spoken information.  Based on the results of the working memory subtests of the WAIS4, Hickel had a Working Memory Index of 60, which fell in the extremely low range or the .4 percentile.

Dr. Eastridge conducted other tests, including the Wide Range Achievement Test 4, which showed that Hickel's word recognition, reading comprehension, and

11

math calculation skills were at a second-grade level.  Dr. Eastridge noted that Hickel's very low reading and math skills were not diagnosed as learning disabilities due to her low IQ, but that "a child with Borderline intellectual ability, that is and [sic] IQ between 75 and 80, would be considered to have learning disabilities in reading and math."  Dr. Eastridge also opined that, because tests showed that Hickel's attention, concentration, and pace were severely impaired, she would need to be supervised at all times at work and "could not perform at a productive pace in a job with deadlines, quotas, or time constraints."

The ALJ credited some portions of Dr. Eastridge's report and rejected others.[11]  At issue in this appeal is the ALJ's decision to reject Dr. Eastridge's opinion that Hickel was "severely impaired in reading and math skills and had impaired memory skills."  The ALJ offered two reasons for rejecting this opinion: (1) Dr. Eastridge examined Hickel only based on her attorney's referral in "an effort to generate evidence for the current appeal" and "was presumably paid for the report"; and (2) Dr. Eastridge's "opinion is inconsistent with the record."

---

[11]Although Hickel suggests otherwise, the ALJ appears to have accepted Dr. Eastridge's diagnosis of mild mental retardation and his test results, given that the ALJ found that Hickel had the severe impairment of mild mental retardation and acknowledged Dr. Eastridge's full scale IQ testing result.  The ALJ rejected Dr. Eastridge's diagnosis of ADHD, explaining that there was no other evidence in the record of a similar diagnosis or that Hickel had received treatment or taken medication for ADHD.  The ALJ credited and gave great weight to Dr. Eastridge's opinion that Hickel's activities of daily living were within normal limits and that she consistently functioned at a higher level than expected given her IQ scores.  The ALJ's reasons for the weight accorded to these portions of Dr. Eastridge's opinion are supported by substantial evidence.

For the following reasons, we conclude that neither of the ALJ's reasons for rejecting Dr. Eastridge's opinion is supported by substantial evidence in the record.

With respect to the ALJ's first reason, there is no evidence in the record that Dr. Eastridge was "hired by [Hickel's] representative" or was "paid for [his] report," as the ALJ states. [12]  In fact, there is no evidence in the record as to how any of the medical sources were paid for their medical opinions.  And, although the ALJ correctly noted that Dr. Eastridge was a "one-time examining physician," that is true of all the examining psychologists who rendered an opinion, including Dr. Klisch and Dr. Morgan, the Commissioner's own consulting psychologist.

Likewise, to the extent the ALJ rejected Dr. Eastridge's opinion because it was obtained "in an effort to generate evidence" about Hickel's mental impairments, that is also true of Dr. Morgan's opinion.  Indeed, generating evidence is the purpose of obtaining opinions from medical sources, whether paid for by the Commissioner or by the claimant.[13]  See 20 C.F.R. §§ 404.1513, 416.913 (explaining that medical sources provide evidence to establish whether the claimant has an impairment, the severity of the impairment, and what the claimant

---

[12]Although not record evidence, Hickel's attorney represented to the Appeals Council that she recommended that Hickel seek a comprehensive psychological evaluation from Dr. Eastridge to determine the nature and extent of Hickel's functional limitations, but that Hickel's parents paid for the evaluation.

[13] Hickel points out, and the Commissioner does not dispute, that the Social Security Administration's Office of Disability Adjudication and Review also frequently employs Dr. Eastridge as an expert witness.

can still do despite the impairment). The fact that Dr. Eastridge was a one-time consultative examiner retained by the claimant rather than the Commissioner is not, standing alone, a valid basis for rejecting his medical opinion.

As to the ALJ's second reason, the ALJ did not identify what evidence in the record is inconsistent with Dr. Eastridge's opinion about Hickel's reading, math, and memory skills. Furthermore, our own review indicates that Dr. Eastridge's opinion is consistent with the other evidence of Hickel's academic and memory skills found in the record, including Dr. Eastridge's own standardized testing of these skills.

Both Hickel and her mother reported that Hickel had reading and math problems. Both stated that Hickel could read only "easy" words and sentences, and could not write a grocery list or read a restaurant menu. Hickel testified that she could read first- and second-grade children's books, but did not understand what she was reading; she obtained her driver's license without taking a written test; she had someone help her complete her job applications; and she left one part-time position as a nursery worker after she was unable to complete an incident report about one child biting another child. In addition, Hickel's mother reported that her daughter had trouble following written instructions and that she (Hickel's mother) had filled out the Social Security Administration's forms for her daughter

14

because her daughter was "not able to completely understand" them due to her "reading problems."

With respect to Hickel's math abilities, Hickel and her mother reported that her mother supervises Hickel's finances, including balancing her checkbook and paying bills, because Hickel cannot handle money matters. Hickel's mother also accompanies her to the grocery store because she cannot count change or determine the balance on her food stamp card. Hickel testified that she could not add, subtract, multiply, or divide. Hickel and her mother also reported that Hickel had problems with memory and completing tasks and that she needed to be reminded to do things, such as brush her teeth or do her chores.

Hickel's school records also reflect problems with reading, math, concentration, and memory. As early as kindergarten, a school social worker, Mary Norris, reported that Hickel had trouble recognizing letters and matching numbers. After an evaluation by a psychologist, Hickel was placed in the speech/language resource program at school. Later in the school year, Hickel was tested by a language diagnostician and found eligible for the language impaired program. When Hickel was in the third grade, school psychologist Eleanor Franzese reported that Hickel was tested in reading and mathematics at a first-grade level and "ha[d] made minimal academic progress." Franzese also noted that Hickel "exhibited a short attention span and difficulty concentrating."

15

In 1991, when Hickel was in fourth grade, Dr. Gerald Kurtz, a school psychologist, performed a psycho-educational evaluation. Among other things, Dr. Kurtz's testing showed memory deficits. For example, the Differential Ability Scales indicated that Hickel fell in the 8th percentile for recall of digits, the 27th percentile for recall of objects-immediate, and the 42nd percentile for recall of objects-delayed. The Woodcock-Johnson Psycho-Educational Battery-Revised indicated that Hickel was in the 22nd percentile for memory for names, the 7th percentile for memory for sentences, the 11th percentile for memory for words, and the 8th percentile for short-term memory. Dr. Kurtz stated that Hickel was "able to retain information after repeated presentations of the same information." Dr. Kurtz's testing also showed that Hickel fell in the 4th percentile for broad reading, the 1st percentile for broad mathematics, and the .3 percentile for broad written language. Dr. Kurtz noted that Hickel had weaknesses in reading, mathematics, and written language, but that she "was able to demonstrate minimally adequate basic calculation skills," most likely because of her "ability to retain repeatedly presented information." At Dr. Kurtz's recommendation, Hickel was placed in the Educable Mentally Handicapped Program.

When Hickel was a senior in high school, Dr. Klisch performed a psychological evaluation for the Division of Vocational Rehabilitation. Dr. Klisch

16

indicated that Hickel was in special education classes for math and English and could write only simple words and sentences.

Finally, Dr. Morgan, the Commissioner's own consulting, examining psychologist, indicated in her report that Hickel could not keep track of money and did not know how to count her change when she shopped. Dr. Morgan stated that Hickel was able to recall a three-word list immediately and five minutes later, which Dr. Morgan opined "suggest[ed] no <u>severe</u> short-term or long-term memory impairment."[14]  (emphasis added.)  However, Hickel was unable to spell the word "world" forwards or backwards, which Dr. Morgan opined might be due to inappropriate attention or concentration, or her intellectual functioning. Hickel was also unable to complete simple math calculations. Further, both of the Commissioner's non-examining medical sources indicated in their mental RFC assessments that Hickel was limited in her ability to understand and remember detailed instructions. Dr. Putney opined that the limitation was moderate, while Dr. Dinwoodie opined that the limitation was marked.[15]

---

[14]The only standardized testing Dr. Morgan administered was the verbal comprehension and perceptual reasoning subtests of the WAIS4. She did not administer the WAIS4 subtests that measure working memory or the logical memory subtests from the WMSR, both of which Dr. Eastridge later administered, and the ALJ did not discount. Thus, Dr. Morgan's statement—that Hickel's ability to recall a three-word list suggested no severe memory impairment—does not, by itself, constitute substantial evidence, nor is it even necessarily inconsistent with Dr. Eastridge's later test findings and opinion that Hickel's working memory and memory for the spoken word were impaired.

[15]Dr. Putney's mental RFC assessment inexplicably states that Hickel can count money, make change, use checks, and pay bills and thus "is able to handle routine financial

17

In short, the record as a whole is consistent with Dr. Eastridge's opinion that Hickel's math and reading abilities are severely impaired and that her working memory and her memory for spoken information are also impaired. Substantial evidence does not support the ALJ's decision to reject Dr. Eastridge's opinion on these points. We note also that the ALJ's decision failed to address Dr. Eastridge's opinion that Hickel would require close supervision and could not perform at a productive pace in a job with deadlines, quotas, or time constraints. This portion of Dr. Eastridge's opinion is particularly material because the three jobs the vocational expert identified as ones Hickel could perform appear to be production jobs. Given the obvious materiality of this part of Dr. Eastridge's opinion, the ALJ was required to address it explicitly. See Cowart, 662 F.2d at 735; see also SSR 96-8P, 1996 WL 374184, at *7 (July 2, 1996) (stating that the ALJ's RFC assessment must consider and address all medical source opinions, and if the RFC assessment conflicts with a medical source opinion, the ALJ "must explain why the opinion was not adopted").

We conclude that a remand is necessary so that the ALJ can reconsider her assessment of Hickel's RFC in light of Dr. Eastridge's opinion on these matters

---

transactions." There is no evidence whatsoever in the record that Hickel could do any of these things; in fact, quite the opposite is true. Although the ALJ did not explicitly rely on Dr. Putney's opinion, we note that a non-examining source's medical opinion is accorded little weight if, as here, it contradicts an examining source's opinion and cannot, standing alone, constitute substantial evidence. See Edwards v. Sullivan, 937 F.2d 580, 584 (11th Cir. 1991); Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988); see also 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

and then re-examine, at steps four and five, whether there is work Hickel can perform.[16]  Additionally, given that neither consulting psychologist who completed a mental RFC assessment had the benefit of Dr. Eastridge's additional testing and report, the ALJ should obtain a new mental RFC assessment that considers all of the medical evidence in the record.

Accordingly, we reverse the district court's judgment and remand the case with instructions that it be returned to the Commissioner for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART and REMANDED.**

---

[16]Because we remand for the ALJ to reconsider her RFC assessment in light of Dr. Eastridge's opinion, we do not address Hickel's third argument that the ALJ's hypothetical questions to the vocational expert improperly included non-existent past relevant work and did not adequately account for Hickel's moderate limitations in concentration, persistence, or pace.