ELIZABETH A. WOLFORD, United States District Judge
INTRODUCTION
Represented by counsel, Plaintiff Randall Ecklund ("Plaintiff") brings this action pursuant to Title II of the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner," or "Defendant") denying his application for disability insurance benefits ("DIB"). (Dkt. 1). This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g). Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 6; Dkt. 10). For the reasons discussed below, the Commissioner's motion (Dkt. 10) is granted and Plaintiff's motion (Dkt. 6) is denied.
BACKGROUND
Plaintiff protectively filed his application for DIB on March 6, 2014. (Dkt. 4 at 26, 89).[1] In his application, Plaintiff alleged disability beginning March 1, 2013, due to a bilateral shoulder injury and lumbar spine injury. (Id. at 26, 78-88). Plaintiff's application was initially denied on May 14, 2013. (Id. at 92-103). At Plaintiff's request, a hearing was held before administrative law judge ("ALJ") Lisa Martin in Alexandria, Virginia, on July 1, 2016. (Id. at 26, 47-77). Plaintiff appeared with his attorney in Jamestown, New York. (Id. ). On August 11, 2016, the ALJ issued a partially favorable decision, awarding Plaintiff benefits as of February 1, 2016, but finding that Plaintiff was not disabled between his alleged onset date of March 1, 2013, and January 31, 2016. (Id. at 22-35). Plaintiff requested Appeals Council review; his request was denied on December 6, 2017, making the ALJ's determination the Commissioner's final decision. (Id. at 6-8). This action followed.
LEGAL STANDARD
I. District Court Review
"In reviewing a final decision of the [Social Security Administration ("SSA") ], this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Talavera v. Astrue , 697 F.3d 145, 151 (2d Cir. 2012) (quotation omitted); see also 42 U.S.C. § 405(g). The *240 Act holds that a decision by the Commissioner is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Moran v. Astrue , 569 F.3d 108, 112 (2d Cir. 2009) (quotation omitted). It is not the Court's function to "determine de novo whether [the claimant] is disabled." Schaal v. Apfel , 134 F.3d 496, 501 (2d Cir. 1998) (quotation omitted); see also Wagner v. Sec'y of Health & Human Servs. , 906 F.2d 856, 860 (2d Cir. 1990) (holding that review of the Secretary's decision is not de novo and that the Secretary's findings are conclusive if supported by substantial evidence). However, "[t]he deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." Byam v. Barnhart , 336 F.3d 172, 179 (2d Cir. 2003) (citing Townley v. Heckler , 748 F.2d 109, 112 (2d Cir. 1984) ).
II. Disability Determination
An ALJ follows a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. See Bowen v. City of New York , 476 U.S. 467, 470-71, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986). At step one, the ALJ determines whether the claimant is engaged in substantial gainful work activity. See 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, in that it imposes significant restrictions on the claimant's ability to perform basic work activities. Id. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments, the analysis concludes with a finding of "not disabled." If the claimant does have at least one severe impairment, the ALJ continues to step three.
At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). Id. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement (id. § 404.1509), the claimant is disabled. If not, the ALJ determines the claimant's residual functional capacity ("RFC"), which is the ability to perform physical or mental work activities on a sustained basis, notwithstanding limitations for the collective impairments. See id. § 404.1520(e).
The ALJ then proceeds to step four and determines whether the claimant's RFC permits the claimant to perform the requirements of his or her past relevant work. Id. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. Id. § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of the claimant's age, education, and work experience. Rosa v. Callahan , 168 F.3d 72, 77 (2d Cir. 1999) (quotation omitted); see also 20 C.F.R. § 404.1560(c).
DISCUSSION
I. The ALJ's Decision
In determining whether Plaintiff was disabled, the ALJ applied the five-step *241 sequential evaluation set forth in 20 C.F.R. § 404.1520. Initially, the ALJ determined that Plaintiff meets the insured status requirements of the Act through December 31, 2018. (Dkt. 4 at 28). At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful work activity since March 1, 2013, the alleged onset date. (Id. ).
At step two, the ALJ found that Plaintiff suffered from the following severe impairments: "bilateral shoulder disorders status post two left surgical repairs and two right surgical repairs (remote and 2016); cervical and lumbar spine disorders ; hypertension ; right knee disorder ; and right wrist arthritis." (Id. ).
At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any Listing. (Id. at 29). The ALJ particularly considered the criteria of Listings 1.00 and 4.00. (Id. ).
Before proceeding to step four, the ALJ determined that prior to February 1, 2016, Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), with the following additional limitations:
The claimant needs a change of position opportunity as often as every 30 minutes for one to two minutes. The claimant must avoid climbing all ladders, ropes, and scaffolding, avoid all crawling tasks, and is limited to occasional climbing of ramps and stairs, balancing, stooping, kneeling, and crouching. The claimant is precluded from all overhead reaching tasks with the upper extremities, and he is limited to frequent, but not constant, upper extremity forward reaching, handling, and fingering tasks. The non-dominant upper extremity is limited to 10 pounds of lifting/carrying on an occasional basis. The claimant must avoid all dangerous work hazards (including unprotected heights and exposed moving machinery), and all exposure to extreme heat, humidity, and cold conditions.
(Id. ). The ALJ further found that beginning February 1, 2016, Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except as follows:
The claimant needs a change of position opportunity as often as every 30 minutes for one to two minutes. The claimant must avoid climbing all ladders, ropes, and scaffolding, avoid all crawling tasks, and is limited to occasional climbing of ramps and stairs, balancing, stooping, kneeling, and crouching. The claimant is precluded from all overhead reaching tasks with the upper extremities, and he is limited to frequent, but not constant, upper extremity forward reaching, handling, and fingering tasks. The non-dominant left upper extremity is limited to 10 pounds of lifting/carrying on an occasional basis and the dominant upper right extremity is limited to no lifting/carrying. The claimant must avoid all dangerous work hazards (including unprotected heights and exposed moving machinery), and [exposure] to extreme heat, humidity, and cold conditions.
(Id. at 32). At step four, the ALJ found that since March 1, 2013. Plaintiff was unable to perform any past relevant work. (Id. at 33).
At step five, the ALJ relied on the testimony of a vocational expert ("VE") to conclude that, prior to February 1, 2016, considering Plaintiff's age, education, work *242 experience, and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform, including the representative occupations of information clerk and furniture rental clerk. (Id. at 33-34). The ALJ further concluded that beginning on February 1, 2016, considering Plaintiff's age, education, work experience, and functional capacity, there were no jobs existing in significant numbers in the national economy that Plaintiff could perform. (Id. at 34). Accordingly, the ALJ found that Plaintiff was not disabled prior to February 1, 2016, but became disabled on that date and had continued to be disabled through the date of the ALJ's determination. (Id. at 34).
II. The Commissioner's Determination is Supported by Substantial Evidence and Free from Legal Error
Plaintiff asks the Court to reverse or, in the alternative, remand this matter to the Commissioner, arguing that (1) the ALJ failed to properly evaluate the opinion of Plaintiff's treating physician Kevin Ouweleen, M.D., that Plaintiff is totally disabled; (2) the ALJ failed to properly evaluate the opinion of Gerald Coniglio, M.D., an independent medical examiner, and the opinion of Dr. Ouweleen, relating to Plaintiff's loss of use of his left arm; and (3) the ALJ's credibility determination is flawed, because she relied on "boilerplate" analysis of Plaintiff's credibility, and she failed to credit Plaintiff's consistent employment as a welder. (Dkt. 6-1 at 12-19). The Court has considered each of these arguments and, for the reasons discussed below, finds them to be without merit.
A. Assessment of Dr. Ouweleen's Opinion
Because Plaintiff's claim was filed before March 27, 2017, the ALJ was required to apply the treating physician rule, under which a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 404.1527(c)(2). Under the treating physician rule, if the ALJ declines to afford controlling weight to a treating physician's medical opinion, he or she "must consider various factors to determine how much weight to give to the opinion." Halloran v. Barnhart , 362 F.3d 28, 32 (2d Cir. 2004) (internal quotation marks omitted). These factors include:
(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.
Id. "An ALJ does not have to explicitly walk through these factors, so long as the Court can conclude that the ALJ applied the substance of the treating physician rule[.]" Scitney v. Colvin , 41 F.Supp.3d 289, 301 (W.D.N.Y. 2014) (internal quotation omitted).
Whatever weight the ALJ assigns to the treating physician's opinion, he must "give good reasons in [his] notice of determination or decision for the weight [he gives to the] treating source's medical opinion." 20 C.F.R. § 404.1527 (c)(2) ; see also Harris v. Colvin , 149 F.Supp.3d 435, 441 (W.D.N.Y. 2016) ("A corollary to the treating physician rule is the so-called 'good reasons rule,' which is based on the regulations specifying that 'the Commissioner "will always give good reasons" ' for the weight given to a treating source opinion." (quoting Halloran , 362 F.3d at 32 ) ). "Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific...." Harris , 149 F.Supp.3d at 441 (internal quotation marks omitted).
Plaintiff began treating with Dr. Ouweleen in 2006. (Dkt. 4 at 464). Plaintiff initially underwent two surgeries, including one *243 surgery on his right shoulder on November 25. 2008, and another surgery on his left shoulder on March 1, 2013. (Id. at 435, 443, 456, 462). Plaintiff "tolerated the [March 1, 2013] procedure well." (Id. at 444). During a follow-up visit with Dr. Ouweleen on March 12, 2013, 11 days post-surgery, Plaintiff reported that he was "doing very well," was "comfortable," and was no longer taking any pain medication. (Id. at 425). During examination, Dr. Ouweleen "was able to abduct [Plaintiff] 60 degrees," and was "sure [Plaintiff] [could] go beyond that." (Id. ). Dr. Ouweleen noted that forward flexion was "about the same." (Id. ). Dr. Ouweleen also found that Plaintiff's left hand was neurovascularly intact and that Plaintiff had a "good active range of motion of his fingers and his elbow." (Id. ). Under the heading "PLAN," Dr. Ouweleen noted that Plaintiff "currently is on total disability." (Id. ).
Plaintiff treated with Dr. Ouweleen on June 13, 2013. (Id. at 421). Dr. Ouweleen noted that Plaintiff "was doing very well," and an examination revealed "very good forward flexion, abduction, internal and external rotation," and that Plaintiff had "excellent rotator cuff strength." (Id. ). Dr. Ouweleen's impression was "excellent progress." (Id. ). Under "PLAN," Dr. Ouweleen assessed that Plaintiff would be able to return to light duty on June 17, 2013, with no "explosive situations with the left shoulder," or "heavy lifting or carrying." (Id. ). Dr. Ouweleen noted that Plaintiff would be considered to have a "mild partial disability at this point." (Id. ). At a follow-up visit with Dr. Ouweleen on July 25, 2013, Plaintiff reported that "although he went back to light duty, he basically has been doing normal duty," and that he "stopped therapy a few weeks ago." (Id. at 420). An examination revealed "very good" range of motion for Plaintiff's left shoulder, and "excellent" rotator cuff strength. (Id. ). Plaintiff had "no pain with provocative testing." (Id. ). Under "PLAN," Dr. Ouweleen noted that Plaintiff was "allowed activities as tolerated at this point." (Id. ).
Plaintiff visited Dr. Ouweleen on September 5, 2013. (Id. at 419). Plaintiff reported that he was back at work lifting duct work overhead and had developed pain in his left shoulder. (Id. ). Plaintiff found it difficult to continue working. (Id. ). An examination revealed tenderness over the biceps, but good range of motion and good rotator cuff strength. (Id. ). Dr. Ouweleen assessed biceps tendonitis, and noted that Plaintiff would continue working, but reassess his pain in 10 days. (Id. ). A September 7, 2013 MRI of Plaintiff's left shoulder (ordered by Dr. Ouweleen) was unremarkable, other than a small amount of fluid in the subacromion bursa. (Id. at 432). Additional findings included a "status post successful surgical repair of a supraspinatus tendon rotator cuff tear," and "status post successful surgical repair of a SLAP tendon." (Id. ). Medical records from the months following reveal that Plaintiff was laid off from work, and that his left shoulder pain continued. (Id. at 415-18).
On January 3, 2014, Plaintiff underwent an additional surgery - a left shoulder arthroscopy with biceps tenotomy and a labral debridement with an open subpectoral biceps tenodesis. (Id. at 388, 392). Plaintiff tolerated the procedure well. (Id. at 393). Following the procedure, Plaintiff returned to physical therapy on February 10, 2014. (Id. at 485). Plaintiff followed-up with Dr. Ouweleen over the next several months, during which he reported soreness, but demonstrated good and improving ranges of motion. (Id. at 774, 776, 780, 782, 784, 786, 788). For example, on March 6, 2014, Dr. Ouweleen noted that Plaintiff "report[ed] continued improvement," and found Plaintiff's range of motion "ha[d] improved dramatically since [his] last visit." (Id. at 776). Plaintiff's forward flexion *244 was full, abduction was 120 degrees, and internal and external rotation were almost equal to the right. (Id. ). Under the "Plan" section for these treatment notes, Dr. Ouweleen noted that Plaintiff was "totally disabled." On January 5, 2015, Dr. Ouweleen examined Plaintiff and found that, based on New York State Workers' Compensation Guidelines, Plaintiff had a 52 percent loss of use of his left arm. (Id. at 792).
The ALJ afforded "great weight" to Dr. Ouweleen's opinion that Plaintiff could return to light duty work after his first left shoulder surgery, and "some weight" to Dr. Ouweleen's January 2015 opinion that Plaintiff had a problem with his left shoulder following his second left shoulder surgery without specific limitations. (Id. at 32). Plaintiff argues that the ALJ did not address any of the factors articulated in 20 C.F.R. § 404.1527(c) ; however, a review of the written determination reveals that this is not the case. The ALJ discussed that Dr. Ouweleen was Plaintiff's treating surgeon (id. at 32), and that Dr. Ouweleen began treating Plaintiff in 2006, and performed three surgeries on Plaintiff between 2006 and 2014 (one on his right shoulder, and two on his left), prior to February 1, 2016 (id. at 30-31). The ALJ also noted that Dr. Ouweleen's opinions were consistent with the record as a whole. (See id. at 32 (Dr. Ouweleen's opinion that Plaintiff could return to light duty work after his first left shoulder surgery "is consistent with the claimant['s] improvement in function of his left shoulder and his reports of activities."); id. at 32, 744 (Dr. Ouweleen's opinion that Plaintiff has a problem with his left shoulder is consistent with the rating of Gerald Coniglio, M.D., a consultative physician who performed an IME in February 2015 and found that Plaintiff had some reduced range of motion, flexion, and adduction, and assessed a 42.5 percent loss of use of the left arm) ).[2] The ALJ further found that "until recently, [Plaintiff's] medical care providers released him to light duty work, consistent with the residual functional capacity assessed." (Id. at 30).
Likewise, the ALJ discussed assessments following Plaintiff's 2014 left shoulder surgery which resulted in opinions similar to Dr. Ouweleen's 2015 opinion, including the May 9, 2014 opinion of Gilbert Jenouri, M.D., that Plaintiff had minimal restrictions walking, standing, sitting long periods, bending, stair climbing, lifting, and carrying. (Id. at 31, 715-718). The ALJ also discussed the assessments of Louis Nunez, M.D., who performed an IME in May 2014, and Dr. Coniglio's February 2015 IME. (Id. at 31). At the May 2014 IME, Dr. Nunez noted some reduced range in Plaintiff's left shoulder. (Id. at 31, 732). At the February 2015 IME, Dr. Coniglio found reduced range of motion and tenderness over the left joint, but assessed no sitting, lifting, bending, or standing restrictions. (Id. at 31, 741, 744). In other words, although the ALJ did not engage in a step-by-step written analysis of each of the 20 C.F.R. § 1527(c) factors, it is clear from the discussion included in the written determination that the ALJ properly considered these factors when assessing Dr. Ouweleen's opinions.
Plaintiff further argues that the ALJ did not properly address Dr. Ouweleen's opinion that Plaintiff was "totally disabled." (Dkt. 6-1 at 12). Plaintiff points to seven visits during which Dr. Ouweleen opined that Plaintiff was "totally disabled" following Plaintiff's January 2014 surgery. (Id. ).
*245 These "opinions" are not accompanied by any meaningful functional assessment and are listed under a heading entitled "Plan" at the end of the treatment notes for Plaintiff's left shoulder injury; they appear to be status updates for planning and treatment purposes, rather than a formal opinion on Plaintiff's ability to work. (See id. at 772, 776, 780, 782, 784. 786, 788). The Court further notes that Dr. Ouweleen's notations that Plaintiff is totally disabled appear to conflict with his treatment notes which, as explained above, reveal that Plaintiff's condition was improving. Conclusory statements of disability, like those contained in Dr. Ouweleen's 2014 post-surgery notes, are not entitled to any weight. See Mary C. v. Comm'r of Soc. Sec. , No. 5:17-CV-927 (ATB), 2018 WL 4689091 at *6-7, 2018 U.S. Dist. LEXIS 167061, at *18-19 (N.D.N.Y. Sept. 28, 2018).
Indeed, it is well-established that a treating physician's opinion that an individual is disabled is not entitled to controlling weight, because the ultimate issue of disability is reserved to the Commissioner. Taylor v. Barnhart , 83 F. App'x 347, 349 (2d Cir. 2003) ; see also Snell v. Apfel , 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative"). However, "if the record contains an opinion from a medical source on an issue reserved to the Commissioner, the ALJ must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." Drozdowski v. Colvin , No. 15-CV-292-MJR, 2016 WL 5402698, at *8, 2016 U.S. Dist. LEXIS 133488, at *24 (W.D.N.Y. Sept. 26, 2016) (internal quotations and citation omitted). Here, the ALJ did not completely disregard Dr. Ouweleen's report that Plaintiff was disabled; rather, he acknowledged this opinion in the written determination. (See Dkt. 4 at 31 ("Prior to this time, Dr. Ouweleen reported that the claimant was totally disabled."); id. at 32 (explaining that "the totality of the evidence does not support a finding of disabled") ). The written determination itself contains a comprehensive recitation of the treatment relationship between Plaintiff and Dr. Ouweleen. based on both Plaintiff's own testimony and the medical records. (Id. at 29-32). The ALJ considered Dr. Ouweleen's opinion relating to Plaintiff's ability to work, in conjunction with Dr. Ouweleen's treatment notes, Plaintiff's testimony, and other medical evidence in the record, including examinations by Drs. Nunez, Coniglio, and Jenouri. In other words, it is apparent, based on the analysis contained in the opinion, that the ALJ considered Dr. Ouweleen's notation that Plaintiff was disabled, even if the written determination does not include a lengthy discussion on that point. See Scitney , 41 F.Supp.3d at 301 ("An ALJ does not have to explicitly walk through [the 20 C.F.R. § 404.1527(c) ] factors, so long as the Court can conclude that the ALJ applied the substance of the treating physician rule").
Plaintiff further makes a cursory statement that the ALJ should have contacted Dr. Ouweleen to obtain clarification of his opinion relating to Plaintiff's ability to work. (Dkt. 6-1 at 15). "[T]here is no duty to re-contact a treating physician to obtain a function-by-function analysis of [p]laintiff's impairments where consultative physicians assess a plaintiff's functional limitations and provide an opinion on them."Sink v. Colvin , No. 12-CV-00239(T)(M), 2015 U.S. Dist. LEXIS 73959, at *44 (W.D.N.Y. Mar. 30, 2015) (internal quotations and citation omitted) (alterations in original), adopted , 2015 WL 3604655, 2015 U.S. Dist. LEXIS 73664 (W.D.N.Y. June 8, 2015). Here, there is no *246 substantial gap in the record; rather, the record is extensive and contains several medical opinions, including relatively consistent opinions from Drs. Ouweleen, Nunez, Coniglio, and Jenouri, relating to Plaintiff's abilities to walk, stand, sit for long periods, bend, climb stairs, lift, carry, and bend. See Perez v. Chater , 77 F.3d 41, 48 (2d Cir. 1996) (no error where ALJ did not re-contact treating physician as "[t]he ALJ had before him a complete medical history, and the evidence received from the treating physicians was adequate for him to make a determination as to disability"); Miller v. Colvin , No. 6:15-CV-0552 (GTS), 2016 WL 4402035, at *7, 2016 U.S. Dist. LEXIS 109757, at *22-23 (N.D.N.Y. Aug. 18, 2016) (ALJ was not required to recontact the plaintiff's treating physician regarding fibromyalgia diagnosis where evidence did not contain obvious gaps). Accordingly, the ALJ was not required to re-contact Dr. Ouweleen to obtain a clarification of his opinion.
B. Assessment of the Loss of Use Evidence
Plaintiff next argues that the ALJ improperly evaluated the opinion of Dr. Coniglio that Plaintiff had a 42.5 percent loss of use of his left arm for his workers' compensation case, as well as Dr. Ouweleen's opinion that Plaintiff had a 52 percent scheduled loss of use of the left arm. (Dkt. 6-1 at 15). Specifically, Plaintiff contends that the ALJ relied on these opinions to justify that Plaintiff could frequently reach with his bilateral upper extremities and therefore had a duty to develop the record, because Dr. Ouweleen's opinion relating to Plaintiff's left arm loss of use did not specify any further limitations. (Id. at 16). Plaintiff does not make any specific argument as to Dr. Coniglio's opinion.
As discussed above, an ALJ has a duty to develop the record, particularly where there are "gaps in the record," or "when the record serves as an inadequate basis on which to render a decision." Grey v. Colvin , No. 14-CV-127S, 2015 U.S. Dist. LEXIS 42796, at *8 (W.D.N.Y. Mar 31, 2015). However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Petrie v. Astrue , 412 F. App'x 401, 406 (2d Cir. 2011) (internal quotation marks omitted). See also Reithel v. Comm'r of Soc. Sec. , No. 6:17-CV-06209 EAW, 330 F.Supp.3d 904, 912, 2018 WL 4445103, at *5, 2018 U.S. Dist. LEXIS 148531, at *15 (W.D.N.Y. Aug. 27, 2018) ("[T]he [ALJ] need only re-contact sources or obtain additional information where there is a conflict or ambiguity that must be resolved but that cannot be resolved based on the evidence present in the record.") (internal quotations and citation omitted).
This case does not present the situation where there is a complete lack of medical opinion evidence relating to Plaintiff's ability to reach. To the contrary, aside from Dr. Ouweleen's January 2015 opinion relating to Plaintiff's loss of use of his left arm, the ALJ also discussed and relied on (1) treatment records from Dr. Ouweleen, from between 2013 and 2015, including that Plaintiff was permitted to return to light duty work following his 2013 left shoulder surgery; (2) a May 2014 consultative examination with Dr. Jenouri, which revealed some improvement in Plaintiff's shoulder, as well as his examination findings of Plaintiff's shoulder, which included shoulder forward elevation right 150 degrees and left 100 degrees, abduction right 150 degrees and left 100 degrees, full range of motion adduction, internal rotation, and external rotation bilaterally; (3) a *247 May 2014 IME with Dr. Nunez, which revealed some reduced range of motion in Plaintiff's left shoulder; and (4) a February 2015 IME with Dr. Coniglio, which revealed reduced range of motion, flexion, and adduction, and a 42.4 percent loss of use of Plaintiff's left arm (an opinion to which the ALJ afforded "some weight"). (See Dkt. 4 at 30-31).
Notably, none of these medical examinations resulted in an opinion that Plaintiff had no ability whatsoever, or even a very limited ability, to use and/or reach with his left arm. Rather, these medical opinions, which all reveal some loss of use in Plaintiff's left arm due to his shoulder impairment, are consistent with the RFC assessment that Plaintiff "is precluded from all overhead reaching tasks with the upper extremities, and he is limited to frequent, but not constant, upper extremity forward reaching, handling, and fingering tasks." The fact that the ALJ did not adopt a specific RFC proposed by any one medical opinion is of no consequence and is not required. Matta v. Astrue , 508 F. App'x 53, 56 (2d Cir. 2013) (ALJ entitled to adopt an RFC that does not "perfectly correspond with any of the opinions of medical sources cited in [her] opinion"). In other words, the ALJ had an adequate record from which she could properly assess Plaintiff's RFC. Given the adequate record, she was not required to procure yet another medical opinion relating to Plaintiff's loss of use of his left arm. See Dougherty-Note boom v. Berryhill , No. 17-CV-00243-HBS, 2018 WL 3866671, at *10, 2018 U.S. Dist. LEXIS 138097 at *35 (W.D.N.Y. Aug, 18, 2018) ("Given the five total medical opinions in the record that were obtained, and the plethora of treatment notes from all of plaintiff's physicians, there is no indication that there were 'obvious gaps' in the record that would have prompted the ALJ to seek additional evidence from plaintiff's primary care doctor"). In sum, Plaintiff has not shown that remand on this basis is warranted.
C. Evaluation of Plaintiff's Credibility
Plaintiff's third and final argument is that the ALJ erred in assessing Plaintiff's credibility. (Dkt. 6-1 at 17). For the reasons set forth below, the Court finds no error in the ALJ's credibility assessment.
The ALJ, who has the "opportunity to observe witnesses' demeanor, candor, fairness, intelligence and manner of testifying," is "best-positioned to make accurate credibility determinations." Whiting v. Astrue , No. CIV.A. 1:12-274, 2013 WL 427171, at *6, 2013 U.S. Dist. LEXIS 15109, at *22 (N.D.N.Y. Jan. 15, 2013), adopted , 2013 WL 427166, 2013 U.S. Dist. LEXIS 14944 (N.D.N.Y. Feb. 4, 2013). As such, "credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are patently unreasonable." Perez v. Barnhart , 440 F.Supp.2d 229, 235 (W.D.N.Y. 2006) (quotation omitted).
In assessing the credibility of a claimant's subjective complaints, the Commissioner's regulations require ALJs to employ a two-step inquiry. Meadors v. Astrue , 370 F. App'x 179, 183 (2d Cir. 2010). "First, the ALJ must determine whether the claimant suffers from a 'medically determinable impairment[ ] that could reasonably be expected to produce' " her symptoms. Id. (quoting 20 C.F.R. § 404.1529(c)(1) ). "Second, the ALJ must evaluate the intensity and persistence of those symptoms considering all of the available evidence; and, to the extent that the claimant's [subjective] contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." Id.
*248 In this case, the ALJ applied the two-step inquiry. At the first step, she found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not fully supported prior to February 1, 2016." (Dkt. 4 at 30). Accordingly, the ALJ assessed Plaintiff's credibility, and pointed to several pieces of evidence that contradict Plaintiff's subjective complaints. First, the ALJ recognized Plaintiff's difficulties using his upper extremities and his multiple surgeries, but noted that, until recently, Plaintiff's medical care providers released him to light duty work.[3] (Id. ). Further, the objective medical evidence showed that, following his 2013 and 2014 left shoulder surgeries, Plaintiff's condition was improving. (Id. at 30-31). Additionally, IMEs performed by Drs. Jenouri, Nunez, and Coniglio showed some reduced range of motion in Plaintiff's left shoulder, and minimal to no restrictions for walking, standing, sitting long periods, bending, stair climbing, lifting, and carrying. (Id. at 31).
Plaintiff argues that the ALJ relied on "boilerplate" language in making the credibility assessment. (Dkt. 6-1 at 18). Plaintiff specifically points to the ALJ's statement that Plaintiff's subjective statements:
could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not fully supported prior to February 1, 2016 for the reasons explained in this decision. However, until recently, the claimant's medical providers released him to light duty work consistent with the residual functional capacity.
(Id. ; Dkt. 4 at 30). The written determination includes a discussion of Plaintiff's application for disability and his testimony at the administrative hearing, including his alleged impairments. (See id. at 29-30). This discussion includes the following information elicited from Plaintiff: his bilateral shoulder injury and lumbar spine injury have limited his ability to work; Plaintiff has difficulty putting a shirt on, due to difficulty raising his arms; Plaintiff is not able to lift more than 10 pounds, and he experiences back pain when walking too much; Plaintiff gets knee pain when climbing stairs, kneeling, and squatting; Plaintiff has difficulty reaching overhead and has a limited range of motion; Plaintiff has "constant" shoulder pain and back pain with increased activity; and Plaintiff has difficulty turning his neck. (Id. ). Following the ALJ's discussion of Plaintiff's alleged impairments, the written determination includes a discussion of specific medical evidence conflicting with Plaintiff's subjective complaints, including: (1) Plaintiff was cleared for light duty work following his 2008 and 2013 surgeries; (2) Plaintiff's reports to his physical therapist following his January 2014 surgery that his symptoms were gradually resolving; (3) a May 9, 2014 consultative examination with Dr. Jenouri, that showed some improvement in Plaintiff's left shoulder, shoulder forward elevation right 150 degrees and left 100 degrees, abduction right 150 degrees and left 100 degrees, full range of motion abduction, *249 internal rotation, and external rotation bilaterally, and Dr. Jenouri's opinion that Plaintiff had minimal restrictions for walking, standing, sitting long periods, bending, stair climbing, lifting, and carrying; and (4) a May 2014 IME by Dr. Nunez revealing that Plaintiff had reduced range of motion in his left shoulder, and (5) a February 2015 IME by Dr. Coniglio, showing that Plaintiff had some reduced range of motion, flexion, and adduction in his left shoulder, but assessing no sitting, lifting, bending, or standing restrictions. (Id. at 30-31).
Accordingly, the Court finds that the ALJ's credibility analysis was not "boilerplate." Rather, the ALJ wrote over two full pages containing information relevant to her credibility analysis, including specific testimony by Plaintiff refuted by specific objective medical evidence. See Trifiletti v. Comm'r of Soc. Sec. , No. 1:14-CV-1427 (GTS/WBC), 2016 WL 536623, at *8, 2016 U.S. Dist. LEXIS 15927, at *25-26 (N.D.N.Y. Jan. 22, 2016) (ALJ's credibility analysis was "far from 'boilerplate,' " where the ALJ "discussed [the plaintiff's] symptoms, her medical treatment, and her activities of daily living"), adopted , 2016 WL 552953, 2016 U.S. Dist. LEXIS 15924 (N.D.N.Y. Feb. 10, 2016) ; Barben v. Colvin , No. 13-CV-6431-FPG, 2015 WL 5773647, at *3, 2015 U.S. Dist. LEXIS 132775, at *10 (W.D.N.Y. Sept. 30, 2015) (no error where the ALJ used the "boilerplate'" language criticized by reviewing courts, but "followed up this boilerplate language with an analysis of [the plaintiff's] alleged conditions, and compared and contrasted them with the medical evidence in the record").
Plaintiff also contends that the ALJ failed to consider his work history as part of her credibility determination. (Dkt. 6-1 at 19). While "a good work history may be deemed probative of credibility," it is "just one of many factors considered in assessing credibility." Motyka v. Colvin , No. 15-CV-54S, 2016 WL 6067846, at *5, 2016 U.S. Dist. LEXIS 143099, at *14 (W.D.N.Y. Oct. 16, 2016) (internal quotations and citations omitted). "That [a plaintiff]'s good work history was not specifically referenced in the ALJ's decision does not undermine the credibility assessment," particularly where there is "substantial evidence supporting the ALJ's determination." Wavercak v. Astrue , 420 F. App'x 91, 94 (2d Cir. 2011).
Here, the ALJ did not specifically discuss Plaintiff's entire work history, but he did acknowledge that Plaintiff worked as a welder since at least 2008, when he sustained his initial right shoulder injury. (Dkt. 4 at 30). The ALJ also acknowledged that Plaintiff returned to work on multiple occasions after surgeries. (Id. at 30-31). It is clear from the record that the ALJ was aware of Plaintiff's history working as a welder and, based on the information included in the written determination, this history was considered by the ALJ in arriving at a decision. See Motyka , 2016 WL 6067846, at *6, 2016 U.S. Dist. LEXIS 143099, at *16 (no error where the ALJ did not explicitly discuss the plaintiff's work history in the credibility analysis, but discussed it when considering the plaintiff's ability to perform prior jobs). Additionally, as noted above, the ALJ discussed several reasons for finding Plaintiff's subjective complaints not credible, including treatment records and opinions in the medical record; specifically, IMEs performed by Drs. Jenouri, Nunez, and Coniglio, and Dr. Ouweleen's treatment notes. See Astolos v. Astrue , No. 06-CV-0678A(F), 2008 U.S. Dist. LEXIS 110546, at *44 n.36 (W.D.N.Y. July 22, 2008) (remand not required when ALJ does not discuss the plaintiff's work history, but identifies other, substantial evidence in the *250 record sufficient to support a credibility finding), adopted , 2009 U.S. Dist. LEXIS 95725 (W.D.N.Y. Oct. 14, 2009). In sum, the Court finds no error in the ALJ's credibility assessment. The ALJ applied the two-step inquiry and set forth well-supported reasons for finding Plaintiff's subjective allegations less than fully credible. Plaintiff has not shown that remand on this basis is warranted.
CONCLUSION
For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Dkt. 10) is granted and Plaintiff's motion for judgment on the pleadings (Dkt. 6) is denied. The Clerk of Court is directed to enter judgment and close this case.
SO ORDERED.

When referencing the page number(s) of docket citations in this Decision and Order, the Court will cite to the CM/ECF-generated page numbers that appear in the upper righthand corner of each document.

The written determination incorrectly identifies the doctor who performed the February 20, 2015 IME as Dr. Nunez. A review of the medical record reveals that this IME was performed by Dr. Coniglio. (Dkt. 4 at 736).

Plaintiff takes issue with the ALJ's statement that until "recently" Plaintiff's employers cleared him for light duty, as Dr. Ouweleen opined since January 2014 that Plaintiff had a 100 percent impairment and was unable to work. (Dkt. 6-1 at 18). As noted above at section II(A), Dr. Ouwleen's notations that Plaintiff was "disabled" were conclusory and not accompanied by any meaningful functional assessment. Further, considering the lengthy treatment relationship between Plaintiff and Dr. Ouweleen, it was only "recently" that Dr. Ouweleen did not clear Plaintiff for work.