ELIZABETH A. WOLFORD, United States District Judge
INTRODUCTION
Proceeding pro se , Plaintiff Charles R. Holdridge ("Plaintiff") brings this action pursuant to Title II of the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner," or "Defendant") denying his application for disability insurance benefits ("DIB"). (Dkt. 1). This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g). Presently before the Court is Defendant's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 10).[1] For the reasons discussed *319 below, Defendant's motion (Dkt. 10) is granted.
BACKGROUND
Plaintiff protectively filed his application for DIB on July 21, 2014. (Dkt. 9 at 13, 124).[2] In his application, Plaintiff alleged disability beginning December 24, 2012, due to post traumatic stress disorder (PTSD), agoraphobia, depression, and alcohol abuse. (Id. at 13, 113). Plaintiff's application was initially denied on October 23, 2014. (Id. at 13). A video hearing was held before administrative law judge ("ALJ") Gregory M. Hamel on January 12, 2016. (Id. at 13, 88-112). Plaintiff appeared in Elmira, New York, and the ALJ presided over the hearing from Alexandria, Virginia. (Id. ). On March 10, 2016, the ALJ issued an unfavorable decision. (Id. at 10-27). Plaintiff requested Appeals Council review; his request was denied on June 22, 2017, making the ALJ's determination the Commissioner's final decision. (Id. at 4-6). This action followed.
LEGAL STANDARD
I. District Court Review
"In reviewing a final decision of the [Social Security Administration ("SSA") ], this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Talavera v. Astrue , 697 F.3d 145, 151 (2d Cir. 2012) (quotation omitted); see also 42 U.S.C. § 405(g). The Act holds that a decision by the Commissioner is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Moran v. Astrue , 569 F.3d 108, 112 (2d Cir. 2009) (quotation omitted). It is not the Court's function to "determine de novo whether [the claimant] is disabled." Schaal v. Apfel , 134 F.3d 496, 501 (2d Cir. 1998) (quotation omitted); see also Wagner v. Sec'y of Health & Human Servs. , 906 F.2d 856, 860 (2d Cir. 1990) (holding that review of the Secretary's decision is not de novo and that the Secretary's findings are conclusive if supported by substantial evidence). However, "[t]he deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." Byam v. Barnhart , 336 F.3d 172, 179 (2d Cir. 2003) (citing Townley v. Heckler , 748 F.2d 109, 112 (2d Cir. 1984) ).
II. Disability Determination
An ALJ follows a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. See Bowen v. City of New York , 476 U.S. 467, 470-71, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986). At step one, the ALJ determines whether the claimant is engaged *320 in substantial gainful work activity. See 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, in that it imposes significant restrictions on the claimant's ability to perform basic work activities. Id. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments, the analysis concludes with a finding of "not disabled." If the claimant does have at least one severe impairment, the ALJ continues to step three.
At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). Id. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement (id. § 404.1509), the claimant is disabled. If not, the ALJ determines the claimant's residual functional capacity ("RFC"), which is the ability to perform physical or mental work activities on a sustained basis, notwithstanding limitations for the collective impairments. See id. § 404.1520(e).
The ALJ then proceeds to step four and determines whether the claimant's RFC permits the claimant to perform the requirements of his or her past relevant work. Id. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. Id. § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of the claimant's age, education, and work experience. Rosa v. Callahan , 168 F.3d 72, 77 (2d Cir. 1999) (quotation omitted); see also 20 C.F.R. § 404.1560(c).
DISCUSSION
I. The ALJ's Decision
In determining whether Plaintiff was disabled, the ALJ applied the five-step sequential evaluation set forth in 20 C.F.R. § 404.1520. Initially, the ALJ determined that Plaintiff last met the insured status requirements of the Act on September 30, 2015. (Dkt. 9 at 15). At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful work activity from his alleged onset date of December 24, 2012, through his date last insured of September 30, 2015. (Id. ).
At step two, the ALJ found that Plaintiff suffered from the severe impairments of PTSD, depression, panic disorder, and alcohol abuse in remission. (Id. at 16). The ALJ further found that Plaintiff's medically determinable impairments of pruritic rash, scabies infestation, and tremors were non-severe. (Id. ).
At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any Listing. (Id. at 17). The ALJ particularly considered the criteria of Listings 12.04, 12.06, and 12.09 in reaching his conclusion. (Id. ).
Before proceeding to step four, the ALJ determined that, through the date last insured, Plaintiff retained the RFC to perform a full range of work at all exertional levels, with the additional non-exertional limitations that Plaintiff:
was able to do routine and repetitive tasks only. [Plaintiff] was unable to perform tasks requiring public contact or *321 more than occasional interactions with coworkers and supervisors.
(Id. at 18). At step four, the ALJ found that through the date last insured, Plaintiff was unable to perform any past relevant work. (Id. at 25).
At step five, the ALJ relied on the testimony of a vocational expert ("VE") to conclude that through the date last insured, considering Plaintiff's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform, including the representative occupations of industrial sweeper/cleaner, motor vehicle assembler, motel cleaner, and packing line worker. (Id. at 26-27). Accordingly, the ALJ found that Plaintiff was not disabled as defined in the Act from the alleged onset date of December 24, 2012, through September 30, 2015, the date last insured. (Id. at 27).
II. The Commissioner's Determination is Supported by Substantial Evidence and Free from Legal Error
The Court has reviewed the record and considered the findings made by the Commissioner at steps one through five of the sequential evaluation. The ALJ's step one determination - that Plaintiff did not engage in substantial gainful work activity from his alleged onset date of December 24, 2012, through his date last insured of September 30, 2015 - is favorable to Plaintiff, and therefore cannot be a basis for remand. See Walker v. Berryhill , No. 6:17-CV-06138 (MAT), 2017 WL 6492520, at *2, 2017 U.S. Dist. LEXIS 208420 at *4-5 (W.D.N.Y. Dec. 19, 2017).
The ALJ's step two determination also is favorable to Plaintiff, as the ALJ determined that Plaintiff had severe impairments, including PTSD, depression, panic disorder, and alcohol abuse in remission. (Dkt. 9 at 16). The ALJ's determination that Plaintiff's medically determinable impairments of pruritic rash, scabies infestation, and tremors were non-severe is supported by the record. As noted above, Plaintiff did not allege these impairments as contributing to his inability to work as of December 24, 2012 (id. at 113), and he did not testify to any of these impairments at his January 2016 administrative hearing (id. at 88-100). Plaintiff complained of a rash on his hands and abdomen beginning in May 2013. (Id. at 302). Amr Elsisi, M.D., diagnosed pruritic rash and prescribed a medication for itching and a topical ointment. (Id. at 302-03). Plaintiff returned in June 2013, having not filled the prescriptions given by Dr. Elsisi. (Id. at 304). Rodrigo Samodal, M.D., diagnosed scabies infestation, and Plaintiff was directed to apply a cream treatment. (Id. at 305). In July 2013, Plaintiff received a referral to dermatology to treat his rash. (Id. at 308). A physical examination in March 2014 revealed "warm and dry" skin, with "no rash." (Id. at 311). There is no indication in the record that Plaintiff's rash and scabies rose to the level of being "severe" within the meaning of the Act, in that they imposed significant restrictions on Plaintiff's ability to perform basic work activities. Id. § 404.1520(c).
Plaintiff began complaining of hand tremors in October 2015, which he said began six to seven years prior. (Dkt. 9 at 420). Plaintiff reported that his tremors had slowly gotten worse and were bothersome. (Id. ). Erica Mendelsohn, PA, diagnosed benign essential tremors in Plaintiff's hands, and prescribed propranolol. (Id. at 429). Like Plaintiff's rash, there is no indication in the record that the benign tremors rose to the level of a severe impairment and affected Plaintiff's ability to work. Accordingly, the ALJ's step two determination is supported by substantial evidence.
*322 The ALJ's step three determination also was proper. The ALJ carefully considered the criteria of Listings 12.04 (depressive disorders ), 12.06[3] (anxiety and obsessive-compulsive disorders ), and 12.09 (substance abuse disorders). (Id. at 17). The ALJ considered each of Plaintiff's severe impairments in the context of the "paragraph B" criteria, i.e. , whether Plaintiff's mental impairments resulted in at least two of the following: marked restrictions of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (Id. ). The ALJ evaluated each of these four categories separately and cited to specific exhibits in the record supporting his determinations. (Id. ). The ALJ's conclusions that Plaintiff: had mild restrictions in his activities of daily living; moderate difficulties in social functioning; moderate difficulties for concentration, persistence, or pace; and had no episodes of decompensation for an extended duration, are supported by the medical record. (Id. ). Similarly, the ALJ considered whether the criteria of "paragraph C" were satisfied. (Id. at 18). The ALJ properly concluded that the evidence did not support the presence of paragraph C criteria, in that
there was no evidence to support that the claimant suffered from a residual disease process in that a small change in mental demands or environment caused him to decompensate. There were no repeated episodes of decompensation. No history was presented of a one or more years' inability to function outside a highly supportive living arrangement. The claimant's panic disorder and PTSD also did not result in complete inability to function independently outside the area of his home.
(Id. ). Based on this information, the Court agrees that, in Plaintiff's case, the paragraph C criteria is not satisfied. Accordingly, the ALJ's step three determination is supported by substantial evidence.
The ALJ's RFC finding also is supported by substantial evidence. For example, in October 2014, T. Harding, the state agency medical consultant, opined that Plaintiff had moderate difficulties in maintaining social functioning and mild limitations in maintaining concentration, persistence, or pace. (Id. at 118). Dr. Harding also opined that Plaintiff was able to sustain attention and concentration for work, but not work closely with others (id. at 119) and retained the mental RFC "for at least unskilled tasks" (id. at 118). This supports Plaintiff's limitations for performing routine and repetitive tasks, avoiding contact with the public, and limiting contact with co-workers and supervisors. See Klotzbach v. Comm'r of Soc. Sec. , No. 1:17-CV-0760 (WBC), 2018 WL 5924790, at *6, 2018 U.S. Dist. LEXIS 193360, at *17 (W.D.N.Y. Nov. 13, 2018) (ALJ "accounted for Plaintiff's moderate difficulties in social functioning by limiting her to occasional contact with supervisors and the public"); Parks v. Comm'r of Soc. Sec. , No. 7:14-CV-1367 (GTS), 2016 WL 590227, at *7, 2016 U.S. Dist. LEXIS 16765, at *20-21 (N.D.N.Y. Feb. 11, 2016) ("the ALJ accounted for Plaintiff's moderate limitation in social functioning by limiting her to *323 occasional contact with the general public and supervisors, and found that she could relate and interact with coworkers sufficiently to complete simple tasks, but should avoid work requiring more complex interaction or joint efforts to achieve work goals", and "accounted for Plaintiff's mild limitation in concentration, persistence, or pace by limiting Plaintiff to simple, repetitive work related tasks in environments that were stable and unchanging and required her to make only simple decisions directly related to the completion of her tasks").
The ALJ also discussed the opinions of Drs. Barlow, Long, and Chen, as well as the opinions of mental health counselors Nicholas Delaney and Paige Freeseman. (Dkt. 9 at 23-34). The ALJ gave little weight to the May 2012, May 2013, and September 2014 opinions of Dr. Barlow, Mr. Delaney, and Ms. Freeseman, respectively, that Plaintiff had marked restrictions in activities of daily living and maintaining social functioning, and frequent deficiencies in concentration, persistence or pace, resulting in a failure to complete tasks in a timely manner. (Id. at 24). The ALJ noted that by October 2012, in his discharge evaluation and summary, Dr. Barlow found that Plaintiff's anxiety was not "significantly interfering." (See id. at 23, 346; see also id. at 345 (noting that Plaintiff "was stable at time of [discharge]. He had dealt with trauma related to police arrest. He was working on issues with his father. [Treatment] interrupted by relocation.") ). The ALJ explained that he gave little weight to these opinions because they were inconsistent with the overall evidence in the record, including Plaintiff's ability "to perform a modest range of daily activities, engage with family members and friends, answer memory related questions satisfactorily, and provide a detailed personal history to medical professionals." (Id. at 24). The ALJ further explained that this evidence demonstrated that Plaintiff had mild restrictions in activities of daily living, and moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. (Id ). The ALJ pointed to specific evidence in the record that called into question the validity of these opinions, and therefore adequately explained why he gave these opinions little weight.
The ALJ gave little weight to the January 2016 opinion of Dr. Chen and Ms. Freeseman that Plaintiff would be off task more than 33 percent of the workday or absent more than three days per month, because there was "no evidence" supporting that opinion. (Id. at 24). The January 8, 2016 opinion issued by Dr. Chen and Ms. Freeseman is contained in a two-page, check-box form. (See id. at 434-35). Dr. Chen and Ms. Freeseman opined that Plaintiff had multiple medium, marked, or extreme limitations, and offered no explanation as to why they arrived at the conclusions relating to Plaintiff's limitations and absenteeism. (Id. ). As noted by the ALJ, their opinions were not supported by the record, and he properly afforded them little weight. See Torbicki v. Berryhill , No. 17-CV-386(MAT), 2018 WL 3751290, at *4, 2018 U.S. Dist. LEXIS 133834, at *10 (W.D.N.Y. Aug. 8, 2018) (ALJ properly afforded opinion of social worker "little weight" because she was not an acceptable medical source, she completed a check-box form in rendering her opinions, and her opinion conflicted with other medical evidence in the record, including the opinion of a consultative examiner); Goodale v. Astrue , 32 F.Supp.3d 345, 358 (N.D.N.Y. 2012) (ALJ did not err by giving little weight to treating physician's opinion that used a "check box" form that Plaintiff's counsel had provided).
Finally, the ALJ discussed the various *324 GAF scores[4] in the record. These included scores of 50 and 52 in May 2012; scores of 45, 65, 30, 51, and 54 between February and April 2014; and most recently, 60 and 65 in October 2015. (Dkt. 9 at 24-25). The ALJ explained that he assessed the GAF scores as having "limited weight," because they were inconsistent with the limited findings on mental status examinations, and because "a low GAF score might reflect difficulties in a wide range of functional areas," but does not necessarily focus on "occupational functioning." (Id. at 25). See Parker v. Comm'r of Soc. Sec. , No. 2:10-CV-195, 2011 WL 1838981, at *6, 2011 U.S. Dist. LEXIS 51791, at *21 (D. Vt. May 13, 2011) ("although a low GAF score may constitute evidence of severe limitations of daily functioning, it is only 'one factor' to consider in determining an individual's ability to perform substantial gainful activity") (citation omitted). The ALJ explained that in Plaintiff's case, his providers consistently noted several Axis IV stressors, including Plaintiff's legal problems and family issues, which do not specifically relate to functional limitations. (Id. ; see, e.g. , id. at 337 ("His thought content is characterized by preoccupation with previous legal problems and incidents with police") ). Coupled with the relatively benign findings on Plaintiff's mental status exams, the ALJ's decision to afford only limited weight to Plaintiff's GAP scores is supported by substantial evidence.
The ALJ also properly evaluated Plaintiff's credibility. The ALJ, who has the "opportunity to observe witnesses' demeanor, candor, fairness, intelligence and manner of testifying," is "best-positioned to make accurate credibility determinations." Whiting v. Astrue , No. CIV.A. 1:12-274, 2013 WL 427171, at *6, 2013 U.S. Dist. LEXIS 15109, at *22 (N.D.N.Y. Jan. 15, 2013), adopted , 2013 WL 427166, 2013 U.S. Dist. LEXIS 14944 (N.D.N.Y. Feb. 4, 2013). As such, "credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are patently unreasonable." Perez v. Barnhart , 440 F.Supp.2d 229, 235 (W.D.N.Y. 2006) (quotation omitted).
In assessing the credibility of a claimant's subjective complaints, the Commissioner's regulations require ALJs to employ a two-step inquiry. Meadors v. Astrue , 370 F. App'x 179, 183 (2d Cir. 2010). "First, the ALJ must determine whether the claimant suffers from a 'medically determinable impairment[ ] that could reasonably be expected to produce' " her symptoms. Id. (quoting 20 C.F.R. § 404.1529(c)(1) ). "Second, the ALJ must evaluate the intensity and persistence of those symptoms considering all of the available evidence; and, to the extent that the claimant's [subjective] contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." Id.
In this case, the ALJ applied the two-step inquiry. (Dkt. 9 at 19). At the first step, he found that Plaintiff's "medically determinable impairments could have reasonably been expected to cause the alleged symptoms" but that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible...." (Id. ).
*325 In reaching this determination, the ALJ considered Plaintiff's "conservative course of treatment and varying treatment compliance" (id. at 21), and that he made "a number of inconsistent statements" (id. at 22). It was proper for the ALJ to consider Plaintiff's noncompliance and conservative treatment in evaluating his credibility. See Pahl v. Berryhill , No. 16-CV-538S, 2018 WL 4327813, at *5, 2018 U.S. Dist. LEXIS 154720, at *14 (W.D.N.Y. Sept. 11, 2018) (conservative course of treatment supported the ALJ's determination that the plaintiff was not as debilitated as she testified); Lee v. Colvin , No. 13-CV-1151-JTC, 2015 WL 3505791, at *6, 2015 U.S. Dist. LEXIS 71883, at *16 (W.D.N.Y. June 3, 2015) (an ALJ is permitted to "consider plaintiff's noncompliance with treatment as a factor weighing against his credibility"). Likewise, the ALJ discussed specific inconsistent statements made by Plaintiff regarding his daily activities and impairments. (See Dkt. 9 at 22 ("[Plaintiff] stated that he rarely left his home and room, had no social life, and drove to medical appointments. Yet, in his function report dated September 2014, he stated that he did not drive. [Plaintiff] also told various mental health professionals that he had his children and nephew over to visit and camped with a neighbor. In October 2015, [Plaintiff] reported to Dr. Albert Chen that he had the Huntington's disease gene. Yet, a few months prior, he told his therapist that he was relieved that he tested negative for the gene that caused Huntington's disease"). The ALJ's consideration of these inconsistencies was proper. See Collins v. Berryhill , No. 1:16-cv-00761-MAT, 2018 WL 6171709, at *6, 2018 U.S. Dist. LEXIS 199665, at *17 (W.D.N.Y. Nov. 26, 2018) (noting that, in making a credibility finding, the ALJ considered Plaintiff's "inconsistent statements concerning his level of activity, which further undermines his credibility").
The additional information submitted by Plaintiff, a letter dated September 26, 2018, written by Thomas A. Minotti, Ph.D., LCSWR, ACSW, does not change the disability conclusion. The letter purports to be a "comprehensive clinical report" by Dr. Minotti, who has treated Plaintiff since he was ten years old. (Dkt. 13 at 1). The letter contains a thorough account of Plaintiff's hardships as a child through his teenage years (id. at 2-3), Plaintiff's employment history (id. at 3-4), and events from his adult life (including incidences during which he was treated wrongfully by police) (id. at 4) which contributed to his impairments. Dr. Minotti opined that Plaintiff's PTSD was "triggered by employers not treating him fairly" and "rejecting him." (Id. at 4). The letter also contains the results of a March 6, 2018 questionnaire regarding Plaintiff's PTSD symptoms. (Id. at 4-8). Dr. Minotti opined that Plaintiff is "permanently disabled from his PTSD condition and therefore should be labeled as such by the Social Security Administration." (Id. at 9). As an initial matter, while the Court appreciates Dr. Minotti's opinion that Plaintiff is permanently disabled, his opinion does not automatically translate to a disability as it is defined in the Act. Rather, "Plaintiff's disability is a determination reserved to the Commissioner." Ewing v. Comm'r of Soc. Sec. , No. 17-CV-68S, 2018 WL 6060484, at *4, 2018 U.S. Dist. LEXIS 197905, at *13 (W.D.N.Y. Nov. 19, 2018) ; see also 20 C.F.R. § 404.1527. Moreover, despite the detailed nature of Dr. Minotti's letter, it does not contain any functional analysis from which Plaintiff's limitations for working could be assessed. In other words, it does not contradict the limitations included in the assessed RFC, and it is not particularly useful to the Court in assessing the ALJ's determination regarding Plaintiff's ability to sustain competitive *326 employment. Accordingly, Dr. Minotti's opinion that Plaintiff is permanently disabled does not change the disability analysis in this case.
At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Dkt. 9 at 25). Like the ALJ's finding at step one, this finding was favorable to Plaintiff, and does not support reversal or remand. Walker , 2017 WL 6492520, at *2, 2017 U.S. Dist. LEXIS 208420, at *9.
Finally, at step five, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed, including the occupations of industrial sweeper/cleaner, motor vehicle assembler, motel cleaner, and packing line worker. (Dkt. 9 at 26-27). Because he assessed additional limitations related to Plaintiff's mental functioning, the ALJ properly called a vocational expert to testify at the administrative hearing and relied on her testimony when making the step five determination. (Id. at 27, 100-11). See Marcano v. Berryhill , No. 16cv08033 (DF), 2018 WL 2316340, at *16, 2018 U.S. Dist. LEXIS 78443, at *45 (S.D.N.Y. Apr. 30, 2018) ("Where ... the claimant suffers from nonexertional impairments (such as mental impairments ) that significantly limit the range of work permitted by his [or her] exertional limitations, the ALJ is required to consult with a vocational expert, rather than rely exclusively on these published Grids") (internal quotations and citations omitted) (alteration in original). At the administrative hearing, the ALJ asked the vocational expert to identify "unskilled jobs" for "someone who is in his 30s with at least a high-school-level education" and "has no significant exertional, postural, manipulative or environmental limitations", but can: "focus attention reliably or affectively only on very routine and repetitive types of tasks, and these tasks would not change much from day to day and would not involve ... any complicated or complex instructions or tasks, or instructions that are hard to remember ... cannot do tasks requiring public contact, either in person or over the phone", and "cannot do tasks that require more than occasional interactions with coworkers." (Dkt. 9 at 102). In response, the vocational expert testified that a person with those limitations could perform the jobs of industrial sweeper cleaner, motor vehicle assembler, hotel cleaner, and packaging line worker. (Id. at 104). In response to questioning by Plaintiff's attorney relating to contact with supervisors (id. at 103), the vocational expert testified that Plaintiff could still perform the above-mentioned occupations (id. at 105). Further, even with proposed additional limitations relating to strict production quotas, there were still multiple jobs in the national economy that Plaintiff could perform, including industrial sweeper cleaner and hotel cleaner. (Id. at 106-07). The ALJ's step five determination is supported by the record, including testimony by the vocational expert. See Dumas v. Schweiker , 712 F.2d 1545, 1554 (2d Cir. 1983) ("[t]here is substantial record evidence to support the assumption upon which the vocational expert based his opinion. Consequently, his opinion that [the plaintiff] had acquired skills in prior work that were transferable to sedentary jobs abundant in the national economy satisfied the Secretary's burden of showing the existence of alternative substantial gainful employment suited to [the plaintiff's] physical and vocational capabilities"). Accordingly, the ALJ's step five determination is supported by substantial evidence.
CONCLUSION
For the foregoing reasons, the Commissioner's motion for judgment on the pleadings *327 (Dkt. 10) is granted. The Clerk of Court is directed to enter judgment and close this case.
SO ORDERED.

Defendant filed a motion for judgment on the pleadings in this matter on March 2, 2018. (See Dkt. 10). Pursuant to Local Rule of Civil Procedure 5.5, a copy of which was provided to Plaintiff at the outset of this case (see Dkt. 3), Plaintiff was required to file responsive papers within 60 days. Plaintiff failed to do so. However, by text order dated October 2, 2018, Plaintiff was afforded until November 2, 2018, to file a response to Defendant's motion, and was advised that his failure to file a response would result in the matter being resolved based on the Administrative Transcript and Defendant's submission. (See Dkt. 12). A copy of the text order was mailed to Plaintiff. Plaintiff has not filed any opposition to Defendant's submission, other than a letter from his therapist, dated September 26, 2018. (Dkt. 13).

When referencing the page number(s) of docket citations in this Decision and Order, the Court will cite to the CM/ECF-generated page numbers that appear in the upper righthand corner of each document.

Beginning on January 17, 2017, PTSD was evaluated under Listing 12.15. See O'Dell v. Colvin , No. 16 Civ. 368 (AJP), 2016 WL 6882861, at *16, n.28, 2016 U.S. Dist. LEXIS 162194, at *47 n.28 (S.D.N.Y. Nov. 22, 2016). Because at the time of the ALJ's written determination this procedure was "not yet in effect, and because [Plaintiff] does not object to [the ALJ's] evaluation of his PTSD under the presently appropriate 12.06, the Court does not discuss the standards in 12.15." Id.

"GAF scores have been removed from the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders and the Administration, in a July 31, 2013 memorandum, indicated that, although GAF scores are opinion evidence, the ALJ should rely more heavily on the clinician's description rather than the numerical range." Genito v. Comm'r of Soc. Sec. , No. 7:16-CV-0143 (GTS), 2017 WL 1318002, at *10, 2017 U.S. Dist. LEXIS 53531, at *37 (N.D.N.Y. Apr. 7, 2017).